[L.A. No. 30824. Dec. 3, 1979.]

BELA GEORGE LUGOSI et al., Plaintiffs and Appellants, v.
UNIVERSAL PICTURES, Defendant and Appellant.

## COUNSEL

Irwin O. Spiegel for Plaintiffs and Appellants.

Grossman & Shames and Harvey M. Grossman as Amici Curiae on behalf of Plaintiffs and Appellants.

Robert L. Wilson for Defendant and Appellant.

Rosenfield, Meyer & Susman, H. Mitchell Gould and Jeffrey L. Nagin as Amici Curiae on behalf of Defendant and Appellant.

## OPINION

**THE COURT.**—We granted a hearing in this case in order to consider the important issues raised. After an independent study of these issues, we have concluded that the thoughtful opinion of Presiding Justice Roth for the Court of Appeal, Second Appellate District, in this case correctly treats the issues, and accordingly adopt it as our own. That opinion, with appropriate deletions and additions,* is as follows:

In September 1930, Bela Lugosi and Universal Pictures Company, Inc. (Universal)[1] concluded an agreement for the production of the film *Dracula* in which Lugosi contracted to and did play the title role. Paragraph 4 of the agreement contained a grant of rights set forth in the footnote.[2]

[Plaintiffs] Hope Linninger Lugosi and Bela George Lugosi, widow and surviving son, respectively, of Bela Lugosi, filed a complaint against Universal on February 3, 1966, alleging that they were the heirs of Bela

---

*Brackets together, in this manner [], are used to indicate deletions from the opinion of the Court of Appeal; brackets enclosing material (other than the editor's parallel citations) are, unless otherwise indicated, used to denote insertions or additions by this court. (*Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 183 [151 Cal.Rptr. 837, 588 P.2d 1261].)

[1]Appellant Universal Pictures, a Division of Universal City Studios, Inc., is the survivor of Universal Pictures Company, Inc. Appellant and its predecessor corporation are referred to herein collectively as Universal.

[2]"The producer shall have the right to photograph and/or otherwise produce, reproduce, transmit, exhibit, distribute, and *exploit in connection with* the said photoplay any and all of the artist's acts, poses, plays and appearances of any and all kinds hereunder, and *shall further have the right to record, reproduce, transmit, exhibit, distribute, and exploit in connection with* said photoplay the artist's voice, and all instrumental, musical, and other sound effects produced by the artist in connection with such acts, poses, plays and appearances. The producer shall likewise have the right to use and give publicity to the *artist's name and likeness*, photographic or otherwise, and to recordations and reproductions of the artist's voice and all instrumental, musical, and other sound effects produced by the artist hereunder, *in connection with* the advertising and exploitation of said photoplay." (Italics added.)

Lugosi (Lugosi) who died in 1956, and that Universal had, commencing in 1960, appropriated and continued to appropriate property which they had inherited from Lugosi and which was not embraced in paragraph 4 of the agreement with Universal. [Plaintiffs] assert that from 1960 until the present time, Universal entered into many licensing agreements which authorized the licensees to use the Count Dracula character. The licensing agreements executed by Universal list the particular movie and the date of the movie in which Lugosi appeared.

The issue as framed by the trial judge is: "[Plaintiffs] seek to recover the profits made by [Universal] in its licensing of the use of the Count Dracula character to commercial firms and to enjoin [Universal] from making any additional grants, without [their] consent.... The action, therefore, raises the question of whether Bela Lugosi had granted to [Universal] in his contracts with [Universal] merchandising rights in his movie portrayal of Count Dracula, the nature of such rights, and whether any such rights, if retained by Bela Lugosi, descended to the [plaintiffs]...."

The trial court found in pertinent part that "the essence of the thing licensed" by Universal to each of its licensees was the "uniquely individual likeness and appearance of Bela Lugosi in the role of Count Dracula." The finding was based upon uncontradicted evidence that it was Lugosi's likeness that was used in the merchandising of Count Dracula notwithstanding the fact that other actors (Christopher Lee, Lon Chaney and John Carradine) appeared in the Dracula role in other Universal films.

The trial court concluded that: Lugosi during his lifetime had a protectable property or proprietary right in his facial characteristics and the individual manner of his likeness and appearance as Count Dracula; that said property or proprietary right was of such character and substance that it did not terminate with Lugosi's death but descended to his heirs; and that [they] acquired all right, title and interest in and to said property under the will of Lugosi.

[Plaintiffs] recovered a judgment for damages and an injunction. Universal appeals.[3]

---

[3]The trial court also held that [plaintiffs'] claim arising from the sales of merchandising rights under licensing agreements entered into by Universal prior to February 3, 1964, were barred by the statute of limitations. [Plaintiffs] cross-appeal from the judgment to the extent it omitted an award on claims arising prior to 1964.

Bram Stoker's 1897 novel Dracula has always been in the public domain in the United States.[4] Universal's film *Dracula,* however, was copyrighted after the studio had purchased the motion picture rights from Florence Stoker, Stoker's heir, and from Hamilton Deane and John Balderston, the authors of the 1927 stage play *Dracula.* (Lugosi had played Count Dracula in the 1927 Deane-Balderston Broadway play.) The trial court found, notwithstanding Universal's copyright in the film, that the character of Count Dracula as described in Stoker's novel is in the public domain in the United States.

Before discussing the applicable law, it should be noted:

There is no allegation in the complaint, no evidence in the record, and no finding of the court that Lugosi in his lifetime alone or with others used his name and/or likeness as Dracula or otherwise in connection with any business, product or service so as to impress a secondary meaning on such business, product or service.

■ However, Lugosi could have created during his lifetime through the commercial exploitation of his name, face and/or likeness in connection with the operation of any kind of business or the sale of any kind of product or service a general acceptance and good will for such business, product or service among the public, the effect of which would have been to impress such business, product or service with a secondary meaning, protectable under the law of unfair competition. (*Johnston v. 20th Century-Fox Film Corp.* (1947) 82 Cal.App.2d 796, 810 [187 P.2d 474].) The tie-up of one's name, face and/or likeness with a business, product or service creates a tangible and saleable product in much the same way as property may be created by one who organizes under his name a business to build and/or sell houses according to a fixed plan or who writes a book, paints a picture or creates an invention.[5]

The trial court found, and the parties have extensively briefed and argued, that the interest in question is one of "property" as that term is

---

[4]Stoker failed to comply with the United States deposit requirements in effect in 1897. In England and other countries adhering to the Berne Convention the novel passed into the public domain in April 1962.

[5]In *Johnston, supra,* the court says at page 810: "An idea given embodiment in tangible form is the subject of common law property right."

Thus, the idea to sell commercial tie-ups, if it had been crystallized into a business by Lugosi during his lifetime would have resulted in property as that term is defined in Civil Code section 654. (See discussion in *Johnston, supra,* p. 808.)

defined in Civil Code section 654. We agree, however, with Dean Prosser who considers a dispute over this question "pointless." (Prosser, *Privacy* (1960) 48 Cal.L.Rev. 383, 406.) "*Once protected by the law,* [the right of a person to the use of his name and likeness]...is a right of value upon which plaintiff can capitalize by selling licenses." (Italics added; Prosser, Law of Torts (4th ed. 1971) p. 807.)

In brief, Lugosi in his lifetime had a right to create in his name and/or likeness "...a right of value," which could have been transmuted into things of value or Lugosi could, if he elected not to exercise such right, protect it from invasion by others by a suit for injunction and/or damages. However, insofar as the record shows, Lugosi had no occasion in his lifetime to sue or restrain anyone because of a purported invasion of his right to commercially exploit his name and likeness.

■ Such "...a right of value" to create a business, product or service of value is embraced in the law of privacy and is protectable during one's lifetime but it does not survive the death of Lugosi. ■ "The law of privacy comprises four distinct kinds of invasion of four different interests of the plaintiff, which are tied together by the common name, but otherwise have almost nothing in common except that each represents an interference with the right of the plaintiff, in the phrase coined by Judge Cooley, 'to be let alone.' Without any attempt to exact definition, these four torts may be described as follows: [¶] 1. Intrusion upon the plaintiff's seclusion or solitude or into his private affairs. [¶] 2. Public disclosure of embarrassing private facts about the plaintiff. [¶] 3. Publicity which places the plaintiff in a false light in the public eye. [¶] 4. *Appropriation, for the defendant's advantage, of the plaintiff's name or likeness.*" (Italics added, Prosser, *Privacy, supra,* 48 Cal.L.Rev. 383, 389.)[6]

Assuming arguendo that Lugosi, in his lifetime, based upon publicity he received and/or because of the nature of his talent in exploiting his name and likeness in association with the Dracula character, had established a business under the name of Lugosi Horror Pictures and sold

---

[6]Item 4 of Dean Prosser's classification of invasions of privacy has been complemented legislatively by Civil Code section 3344, adopted in 1971. [That section provides for the recovery of damages for the unauthorized commercial use of another persons's "name, photograph, or likeness," under specified conditions. One commentator suggests that section 3344 may confer a property right in one's personal identity, i.e., a "right of publicity." (Note (1972) 3 Pacific L.J. 651, 669.) Significantly, section 3344 does not purport to create a descendible right enforceable by the heirs of the person whose identity was appropriated.]

licenses to have "Lugosi as Dracula"[7] imprinted on shirts, and in so doing built a large public acceptance and/or good will for such business, product or service, there is little doubt that Lugosi would have created during his lifetime a business or a property wholly apart from the rights he had granted to Universal to exploit his name and likeness in the characterization of the lead role of Count Dracula in the picture *Dracula.*

However, even on the above assumption, whether Lugosi's heirs would have succeeded to such property depends entirely on how it was managed before Lugosi died. Lugosi may have sold the property and spent the consideration before he died, or sold it for installment payments and/or royalties due after his death, in which latter event such payments and/or royalties would, of course, be a part of his estate.

"There has...been a good deal of consistency in the rules that have been applied to the four disparate torts under the common name. As to any of the four, it is agreed that the plaintiff's right is a personal one, which does not extend to members of his family, unless, as is obviously possible, their own privacy is invaded along with his. The right is not assignable, and while the cause of action may or may not survive after his death, according to the survival rules of the particular state, *there is no common law right of action for a publication concerning one who is already dead.*" (Italics added, fns. omitted, Prosser, Law of Torts, *supra,* pp. 814-815.)

[Although, as we discuss hereafter, the right to exploit one's name or likeness may be assignable,] [ ] a number of decisions support the italicized conclusion.

In *Maritote* v. *Desilu Productions, Inc.* (7th Cir. 1965) 345 F.2d 418 [18 A.L.R.3d 863] (cert. den. 382 U.S. 883 [15 L.Ed.2d 124, 86 S.Ct. 176], the administratrix of the estate of Al Capone brought an action for unjust enrichment arising out of the defendant's alleged appropriation of the name, likeness and personality of Al Capone. The widow and son of Al Capone brought an action for invasion of their privacy, based on the same appropriation. The plaintiffs argued that the property rights of Al Capone, his name, likeness and personality, did not fall into the public domain upon his death, but passed to his heirs. Defen-

---

[7]For the purpose of the illustration, we assume [plaintiffs'] position that Universal would have had no conflicting rights. As stated *infra* we do not decide this question.

dants argued that the action for unjust enrichment was in essence an action for the invasion of the right of privacy of Al Capone, which could not survive his death. The court agreed with the defendants, holding that the relief sought by the plaintiffs was essentially that of a claimed invasion of a right of privacy, and judgment was entered for the defendants. In support of its position, the court relied upon Dean Prosser's cited article *Privacy* in 48 Cal.L.Rev. 383.

In *Schumann v. Loew's Incorporated* (Sup. Ct. 1954) 135 N.Y.S.2d 361, some of the great-grandchildren of composer Robert Schumann brought suit against the defendant for misappropriation of a property right once belonging to the famous composer in the latter's name. Plaintiffs attempted to analogize the property right in a man's name to the right found in real property through citation of cases. In denying recovery to plaintiffs, the court stated: "None of them [cases cited by the plaintiffs] supports plaintiff's contention that a motion picture depicting the life of one who died almost one hundred years earlier is an infringement upon the deceased's property right in his name which descended to his heirs or next of kin." (*Schumann v. Loew's Incorporated, supra,* at p. 369.)

In *James v. Screen Gems, Inc.* (1959) 174 Cal.App.2d 650 [344 P.2d 799], the widow of Jesse James, Jr., brought suit against a film producer of a television show portraying the life of her husband. Both the first and second causes of action alleged that there had been "exploitation of plaintiff's deceased husband's personality and name for commercial purposes." (174 Cal.App.2d at p. 651.) The court treated both causes of action as personal to the deceased so that even if there was an invasion of the right of privacy it was not a right that survived death.

■ When the right invaded was more strictly the privilege "to be let alone," the courts in this state have refused to extend to the heirs of the (potential) plaintiff the right to recover for the invasion of that right: "It is well settled that the right of privacy is purely a personal one; it cannot be asserted by anyone other than the person whose privacy has been invaded, that is, plaintiff must plead and prove that *his* privacy has been invaded. (*Coverstone v. Davies* (1952) 38 Cal.2d 315, 322-324 [239 P.2d 876]; *Werner v. Times-Mirror Co.* (1961) 193 Cal.App.2d 111, 116 [14 Cal.Rptr. 208]; *James v. Screen Gems, Inc.* (1959) 174 Cal.App.2d 650, 653 [344 P.2d 799]; *Kelly v. Johnson Publishing Co.* (1958) 160 Cal.App.2d 718, 722 [325 P.2d 659]; *Metter v. Los Angeles Examiner* (1939) 35 Cal.App.2d 304, 310 [95 P.2d 491]; 4 Witkin, Summary of Cal. Law (8th ed.) Torts, § 342, p. 2605.) Further, the

right does not survive but dies with the person." (*Hendrickson* v. *California Newspapers, Inc.* (1975) 48 Cal.App.3d 59, 62 [121 Cal.Rptr. 429].)

There is good reason for the rule. The very decision to exploit name and likeness is a personal one. It is not at all unlikely that Lugosi and others in his position did not during their respective lifetimes exercise their undoubted right to capitalize upon their personalities, and transfer the value thereof into some commercial venture, for reasons of taste or judgment or because the enterprise to be organized might be too demanding or simply because they did not want to be bothered.

It seems to us rather novel to urge that because one's immediate ancestor did not exploit the flood of publicity and/or other evidence of public acceptance he received in his lifetime for commercial purposes, *the opportunity* to have done so is property which descends to his heirs. Yet [plaintiffs'] claim boils down to this: now that Bela Lugosi is dead, they are the only ones who should have the opportunity to exploit their ancestor's personality.

If the opportunities of a person to exploit a name or likeness in one's lifetime are inheritable property, may it be assumed that if the first heirs thereof, like their immediate ancestor, do not exploit similar opportunities the right to do so is automatically transferred to succeeding heirs? [May the remote descendants of the historic public figures obtain damages for the unauthorized commercial use of the name or likeness of their distinguished ancestors? If not, where is the line to be drawn, and who should draw it? Assuming that some durational limitation would be appropriate, it has been suggested that the adoption of such a limitation would be "beyond the scope of judicial authority," and that "legislative action will be required...." (Note (1978) 29 Hastings L.J. 751, 774; see *Maritote* v. *Desilu Productions, Inc., supra,* 345 F.2d 418, 420.) Certainly the Legislature by appropriate amendment to Civil Code section 3344 (see fn. 6, *ante*), might recognize a right of action on behalf of the family or immediate heirs of persons such as Lugosi. For the reasons stated above, however, we decline to adopt judicially any such rule.

Thus, under present law,] upon Lugosi's death anyone, related or unrelated to Lugosi, with the imagination, the enterprise, the energy and the cash could, in [his or her] own name or in a fictitious name, or a trade name coupled with that of Lugosi, have impressed a name so se-

lected with a secondary meaning and realized a profit or loss by so doing depending upon the value of the idea, its acceptance by the public and the management of the enterprise undertaken. After Lugosi's death, his name was in the public domain. Anyone, including [plaintiffs], or either of them, or Universal, could use it for a legitimate commercial purpose.

We are not prepared to say, however, that [plaintiffs] or any person other than Universal could have attempted to build a business with a secondary meaning, which business exploited the name Lugosi, and coupled *Lugosi's name* with that of Dracula. That question is not before us.

The learned trial judge, in holding that the name and likeness are "property" which can pass to the heirs, relied on a line of cases which purport to recognize such a "property right" as opposed to the right of privacy founded in tort (e.g., *Haelan Laboratories* v. *Topps Chewing Gum* (2d Cir. 1953) 202 F.2d 866; *Uhlaender* v. *Henricksen* (D.Minn. 1970) 316 F.Supp. 1277; *Cepeda* v. *Swift and Company* (8th Cir. 1969) 415 F.2d 1205.)

The question which these cases pose is this: if the right to exploit name and likeness can be assigned because it is a "property" right (*Haelan*), is there any reason why the same right cannot pass to the heirs?

■ Assignment of the right to exploit name and likeness by the "owner" thereof is synonymous with its exercise. In all of the above cases *the owner* of the right did assign it in his lifetime and, too, Lugosi did precisely this in his lifetime when he assigned his name and likeness to Universal for exploitation in connection with the picture *Dracula*. (*Ante,* fn. 2.) Assertion by the heirs of the right to exploit their predecessor's name and likeness to commercial situations he left unexploited simply is *not* the exercise of that right by *the person* entitled to it.[8] Thus, whether or not the right sounds in tort or property, and we think

---

[8]We have analyzed *Price* v. *Hal Roach Studios, Inc.* (S.D.N.Y. 1975) 400 F.Supp. 836, which relies in part on the trial court's opinion. [] [*Roach* found "no logical reason to terminate this right [of publicity] upon death of the person protected." (P. 844.) To the contrary, as we have explained, a rule of nondescendibility is justified by the personal nature of the right, coupled with the difficulty in judicially selecting an appropriate durational limitation were it held descendible to one's heirs. (See also *Factors Etc., Inc.* v. *Pro Arts, Inc.* (2d Cir. 1978) 579 F.2d 215, 220-222; *Factors Etc., Inc.* v. *Creative Card Co.* (S.D.N.Y. 1977) 444 F.Supp. 279, 282-285.)]

with Dean Prosser that a debate over this issue is pointless, what is at stake is the question whether this right is or ought to be personal.

■ The so-called right of publicity means in essence that the reaction of the public to name and likeness, which may be fortuitous or which may be managed or planned, endows the name and likeness of the person involved with commercially exploitable opportunities. The protection of name and likeness from unwarranted intrusion or exploitation is the heart of the law of privacy.

If rights to the exploitation of artistic or intellectual property never exercised during the lifetime of their creators were to survive their death, neither society's interest in the free dissemination of ideas nor the artist's rights to the fruits of his own labor would be served. Authority, as noted, supports the strong policy considerations which underline the conclusion that the right is personal.

■ We hold that the right to exploit name and likeness is personal to the artist and must be exercised, if at all, by him during his lifetime. [End of Court of Appeal opinion.]

The judgment is reversed and the trial court is directed to enter a new judgment in favor of Universal for its costs. Plaintiffs' cross-appeal is dismissed as moot. Universal shall recover its costs of appeal.

**MOSK, J.**—With the majority of my colleagues I concur in the judgment, and in the opinion of Presiding Justice Roth. Because this is a matter of first impression in our court, I am impelled to add some observations.

Factually and legally this is a remarkable case. Factually: not unlike the horror films that brought him fame, Bela Lugosi rises from the grave 20 years after death to haunt his former employer. Legally: his vehicle is a strained adaptation of a common law cause of action heretofore unknown either in a statute or case law in California.

The plaintiffs, and my dissenting colleagues, erroneously define the fundamental issue, and consistently repeat their misconception. We are not troubled by the nature of Lugosi's right to control the commercial exploitation of *his* likeness. That right has long been established. (*Haelen Laboratories* v. *Topps Chewing Gum* (2d Cir. 1953) 202 F.2d 866, 868; *Cepeda* v. *Swift and Company* (8th Cir. 1969) 415 F.2d 1205,

1206; *Uhlaender* v. *Henricksen* (D.Minn. 1970) 316 F.Supp. 1277, 1282.) The issue here is the right of Lugosi's successors to control the commercialization of a likeness of a dramatic character—i.e., Count Dracula—created by a novelist and portrayed for compensation by Lugosi in a film version produced by a motion picture company under license from the successor of the novelist. The error in discerning the problem pervades the trial court's conclusion. Inevitably one who asks the wrong question gets the wrong answer.

Bela Lugosi was a talented actor. But he was an actor, a practitioner of the thespian arts; he was not a playwright, an innovator, a creator or an entrepreneur. As an actor he memorized lines and portrayed roles written for him, albeit with consummate skill. In this instance the part he played was that of Count Dracula, a legendary character out of the novel originated by Bram Stoker,[1] first published in England in 1897, and adapted for the screen by writers employed by Universal Pictures. Due to copyright omission, at all times involved herein the novel and its characters had been in the American public domain.

Merely playing a role under the foregoing circumstances creates no inheritable property right in an actor, absent a contract so providing. Indeed, as the record discloses, many other actors have portrayed the same role, notably Lon Chaney and John Carradine; the first movie was a European version released in 1922 with Max Schreck as the Count. Thus neither Lugosi during his lifetime nor his estate thereafter owned the exclusive right to exploit Count Dracula any more than Gregory Peck possesses or his heirs could possess common law exclusivity to General MacArthur, George C. Scott to General Patton, James Whitmore to Will Rogers and Harry Truman, or Charlton Heston to Moses.

I do not suggest that an actor can never retain a proprietary interest in a characterization. An original creation of a fictional figure played exclusively by its creator may well be protectible. (*Goldstein* v. *California* (1973) 412 U.S. 546 [37 L.Ed.2d 163, 93 S.Ct. 2303].) Thus Groucho Marx just being Groucho Marx, with his moustache, cigar, slouch and leer, cannot be exploited by others. Red Skelton's variety of self-devised roles would appear to be protectible, as would the unique

---

[1]There has long been a debate in literary circles as to whether Dracula is wholly fictional or the prototype of an actual nobleman who once lived in Rumania, in the Transylvanian Alps. In travel literature the government of Rumania—motivated, one suspects, by the potential rewards of tourism—identifies a specific Carpathian castle as the ancestral home of the Count.

personal creations of Abbott and Costello, Laurel and Hardy and others of that genre. Indeed the court in a case brought by the heirs of Stanley Laurel and Oliver Hardy (*Price* v. *Hal Roach Studios, Inc.* (S.D.N.Y. 1975) 400 F.Supp. 836) observed at page 845: "we deal here with actors portraying themselves and developing their own characters...."

Here it is clear that Bela Lugosi did not portray himself and did not create Dracula, he merely acted out a popular role that had been garnished with the patina of age, as had innumerable other thespians over the decades. His performance gave him no more claim on Dracula than that of countless actors on Hamlet who have portrayed the Dane in a unique manner.

Unquestionably an inheritable property right can be either created or eliminated by contract. There was an employment contract here giving Universal the right to exploit "any and all of the artist's acts, poses, plays and appearances." Whether the contractual right was intended to be limited to exploitation of the presentation of the photoplay is disputed by the parties. To resolve that conflict and ambiguities in the contract we should turn either to expert testimony concerning custom of the industry—none was admitted here—or to the law. Fortunately the Legislature has given us guidance.

In the absence of precise provisions of a contract to the contrary, Labor Code section 2860 (formerly Civ. Code, § 1985) must be read into every employment relationship. The statute provides: "Everything which an employee acquires by virtue of his employment, except the compensation which is due to him from his employer, belongs to the employer, whether acquired lawfully or unlawfully, or during or after the expiration of the term of his employment."

The foregoing principle has been universally accepted. In *Zahler* v. *Columbia Pictures Corp.* (1960) 180 Cal.App.2d 582 [4 Cal.Rptr. 612], the heirs of a musical composer sued for damages when music written under contract to a film studio as a motion picture background was subsequently transferred to and used by a television station. Said the court at page 589: "where an employee creates something as part of his duties under his employment, the thing created is the property of his employer...." Similarly in *Treu* v. *Garrett Corp.* (1968) 264 Cal.App.2d 432, 436 [70 Cal.Rptr. 284], an invention created by an employee was held to belong to the employer because that was the very reason he "was hired and paid."

By parity of reasoning, Lugosi, the employee, was hired and paid —handsomely, circa 1931—by Universal, the employer, to create a version of Count Dracula in a motion picture. The product of that employment and all the residuals flowing therefrom belong, under the legislative enactment, to the employer. Had the employee desired to withhold any effects of the employment from exploitation by the employer, he could have so provided in the agreement. There is no exclusion in the instant employment contract.

To the same effect is *Famous Players-Lasky Corp.* v. *Ewing* (1920) 49 Cal.App. 676 [194 P. 65]. There an electrical device was conceived by the motion picture studio employer, but the originality and unique skill in inventing the actual lights was that of the employee-electrician. The court held that despite the manual dexterity and creative skill of the employee, the product belonged to the employer. Again the analogy is clear to the instant case: Universal as employer conceived the use of Dracula as a motion picture and acquired the rights thereto from the successor of the author; Lugosi as employee was hired to and did apply his creative skill to performing in the film. As in *Famous Players-Lasky*, the product and all the rights flowing therefrom belong to the employer.

Finally, I must comment briefly on the problems my dissenting colleagues face when they attempt to determine the temporal limitations of their version of the right of publicity. May the descendants of George Washington sue the Secretary of the Treasury for placing his likeness on the dollar bill? May the descendants of Abraham Lincoln obtain damages for the commercial exploitation of his name and likeness by the Lincoln National Life Insurance Company or the Lincoln division of the Ford Motor Company? May the descendants of James and Dolly Madison recover for the commercialization of Dolly Madison confections?

Although conceding it is inherently a policy decision, and without statutory guidance or case authority, the dissent by mere *ipse dixit* selects the copyright period, i.e., the author's life plus 50 years.

I suggest that if the copyright statute can be adapted to an artistic or literary creation where there is no actual recorded American copyright, then all rights to exploitation of Dracula would have been vested not in Lugosi and his heirs but in the author, Bram Stoker. Parenthetically, Stoker retained a copyright protection abroad, and his book did not fall

into the public domain in England and in countries adhering to the Berne Convention until April of 1962. This was, of course, long after Lugosi's performances for Universal. While Universal protected itself by contracting in 1930 with Florence Stoker, Bram Stoker's successor, and with the playwrights who adapted the Broadway theatrical version of Dracula, if Lugosi had attempted to exploit Dracula in 1948, 1931, or 1936, he would have been liable in damages to the Stoker estate. The heirs should have no greater rights now than Lugosi would have had in his lifetime.

A salutary tendency today is to encourage the free dissemination of ideas—political, literary, artistic—even by commercial sources. (See, e.g., *Sears, Roebuck & Co.* v. *Stiffel Co.* (1964) 376 U.S. 225, 231 [11 L.Ed.2d 661, 666-667, 84 S.Ct. 784].) If Bela Lugosi were alive today, he would be unable to claim an invasion of his right to privacy for Universal's exploitation not of Lugosi qua Lugosi but of products created in the image of Count Dracula, a role Lugosi played. On a right of privacy theory his successors concededly would be denied the substantial rewards they neither earned nor otherwise deserved two decades after Lugosi's death. To approve such a bonanza on a newly created cause of action, heretofore unknown in California, ill serves the principles of free expression and free enterprise.

I agree with the Court of Appeal that we must reverse the judgment.

**BIRD, C. J.**—I respectfully dissent.

Although Bela Lugosi died more than 20 years ago, his name still evokes the vivid image of Count Dracula, a role he played on stage and in motion pictures. So impressed in the public's memory, the image of Lugosi as Dracula was profitably marketed by defendant Universal Pictures, which had employed Lugosi to portray Count Dracula in the motion picture *Dracula*. Specifically, Universal Pictures concluded licensing agreements which authorized the use of Lugosi's likeness in his portrayal of Count Dracula in connection with the sale of numerous commercial merchandising products.

Plaintiffs, beneficiaries under Bela Lugosi's will, commenced this action for damages and an injunction against further licensing of Lugosi's likeness on the ground that such use was unauthorized and infringed on their interest in controlling the commercial use of Lugosi's likeness. This case thus presents the novel question in California of the nature

and scope of an individual's interest in controlling the commercial exploitation of his or her likeness. I conclude that Universal Picture's licensing of Lugosi's image was unauthorized and infringed on Lugosi's proprietary interest in his likeness. Since that interest is inheritable, the trial court correctly held that plaintiffs are entitled to damages and injunctive relief.

## I. The Facts

Bela Lugosi (Lugosi) and defendant, Universal Pictures (Universal), entered into a series of agreements relating to Lugosi's portrayal of the character Count Dracula.[1] Under an employment contract dated September 11, 1930, Lugosi agreed to play the part of Count Dracula in the motion picture *Dracula*,[2] which was released by Universal in 1931. In connection with the execution of another employment contract in February 1936, Universal obtained Lugosi's written permission to use in the motion picture *Dracula's Daughter* a wax image of Lugosi's face and head as Count Dracula. This bust was a representation of Lugosi's appearance in *Dracula*. In 1948, Lugosi again agreed to play Count Dracula in the Universal motion picture *Abbott and Costello Meet Frankenstein*.[3]

In 1960, four years after Lugosi's death, Universal began to enter into licensing agreements with various businesses for the use of the Count Dracula character in connection with certain commercial merchandising products. By 1966, when this action was filed, Universal had concluded approximately 50 such licensing agreements. The agreements authorized the use of the likeness of Count Dracula in connection with the sale of such products as plastic toy pencil sharpeners, plastic model figures, T-shirts and sweat shirts, card games, soap and detergent products, picture puzzles, candy dispensers, masks, kites, belts and belt buckles, and beverage stirring rods.

---

[1]The initial agreements were executed by Universal Pictures Corporation, predecessor of Universal Picture Company, Inc. The latter corporation was subsequently merged into Universal City Studios, Inc., and is now known as Universal Pictures, a division of Universal City Studios, Inc. Defendant and its predecessor corporations are herein referred to as Universal. Universal is a wholly owned subsidiary corporation of MCA, Inc.

[2]Universal simultaneously secured motion picture rights to the novel Dracula, first published in 1897, and the stage play based thereon. The stage play was first performed in 1927 with Bela Lugosi portraying Count Dracula. An earlier motion picture depicting the character Count Dracula had been produced in 1922.

[3]Numerous other actors, including Lon Chaney, Jr., Christopher Lee and John Carradine, have played the part of Count Dracula in motion pictures or on stage. Some of those motion pictures were produced and/or distributed by Universal.

The licenses granted by Universal specifically authorized the use of Lugosi's likeness from his portrayal of Count Dracula in *Dracula* and *Dracula's Daughter*. No agreement made reference to any other actor's portrayal of Count Dracula. Nearly all of these agreements also granted merchandising rights in other horror film characters.[4] The agreements provided that Universal had the right to license the commercial use of the names, characteristics, and images of all these characters. However, the licensee was precluded from using the name of the actor who played each character in its commercial activities.

Plaintiffs, Lugosi's surviving son and widow, learned of the commercial use of Lugosi's likeness in his portrayal of Count Dracula in April 1963. They filed suit in August 1963 seeking damages and injunctive relief on the ground that licensing his likeness was unauthorized and infringed on a valuable property right, the commercial value of Lugosi's likeness. Universal moved to dismiss the complaint on the ground that Lugosi's estate was the proper plaintiff. Plaintiffs were subsequently granted a voluntary dismissal without prejudice so that Lugosi's estate could be reopened to determine the distribution of property not considered in the earlier decree of distribution. In 1966, after plaintiffs had been awarded all causes of action belonging to the estate, the present action was filed.

The trial court concluded that the essence of Lugosi's portrayal of Count Dracula was found in his "facial characteristics and in the uniquely individual manner of his likeness and appearance." The court further found that Universal had not granted its licensees the right to use a likeness of a Count Dracula character generally consistent with the character described in the novel Dracula. Rather, Universal had licensed the "uniquely individual likeness and appearance" of Lugosi in his portrayal of Count Dracula.

The trial court held that Universal had no contractual right to license such use. A grant-of-rights provision in the 1930 contract was interpreted to authorize Universal to photograph and record Lugosi's portrayal of Count Dracula in *Dracula*, to distribute the resulting motion picture, and to publicize Lugosi's name, likeness, acts and appearances in connection with advertising the motion picture. (See *post*, fn. 37.) However, Universal's commercial licensing agreements were found to

---

[4]The other licensed characters included the Frankenstein Monster, the Wolf Man, the Mummy, the Creature from the Black Lagoon, the Phantom of the Opera, Mr. Hyde, the Mutant, the Mole Man, and the Hunchback of Notre Dame.

have been completely separate and apart from any advertising concerning the re-release of *Dracula* to movie theaters or its broadcast on television. Further, the trial court concluded that Lugosi did not otherwise grant to Universal the right to exploit his portrayal of Count Dracula in connection with the sale of commercial products.[5]

Lugosi was found to have a protectible proprietary interest in the commercial use of his likeness and appearance, independent of the protection afforded by the common law right of privacy. This protection extended to Lugosi's likeness in his distinctive portrayal of Count Dracula. This proprietary right did not terminate upon Lugosi's death but descended to his beneficiaries, plaintiffs. Since neither Lugosi nor plaintiffs had authorized Universal to license the use of Lugosi's likeness in his portrayal of Count Dracula, such use constituted a tortious interference with plaintiffs' interests, entitling plaintiffs to recover damages.

The trial court found that the applicable statute of limitations for the appropriation of a protectable proprietary interest was two years (Code Civ. Proc., § 339, subd. 1), and that each license, and each renewal or extension thereof, constituted a separate tort. Therefore, plaintiffs were entitled to damages for each license agreement or renewal thereof executed or commenced within two years of the filing of this action on February 3, 1966.[6] The initiation of the present action, rather than the filing of plaintiffs' suit in August 1963, was found to be the critical date for measuring the recovery period since the present action was not considered a continuation of the 1963 lawsuit.

In connection with the approximately 35 licensing agreements for which recovery was not barred by the statute of limitations, Universal received more than $260,000 in royalties. After considering detailed evidence on the proportion of that amount which resulted from licensing the use of Lugosi's likeness as compared to other characters and on the extent of Universal's expenses, the trial court awarded plaintiffs $53,023.23 in damages. Plaintiffs were also awarded prejudgment interest on this amount from January 1, 1969, the "mid-point of defendant's

---

[5]The trial court also found that the 1936 contract between Lugosi and Universal, which purported to constitute a full settlement and compromise of all claims and demands which Lugosi had or might have in the future against Universal, based on their prior contracts, did not preclude an action for a tortious appropriation of his image arising many years after that agreement.

[6]Thus, the trial court found that plaintiffs were not entitled to damages based on any royalty received after February 3, 1964, if that royalty was derived from contracts or extensions executed *before* that date.

infringement." (See Civ. Code, § 3288.) The court further permanently enjoined Universal and its affiliated and/or related corporations from making or entering into any contract or license agreement which grants, authorizes, permits or licenses the use of Lugosi's name, likeness or appearance in his portrayal of Count Dracula in connection with the sale or advertisement of any commercial merchandising product. The injunction does not apply to either the exhibition of the motion pictures produced by Universal in which Lugosi appeared as Count Dracula or to the dissemination or broadcast of any biographical information about Lugosi.[7]

Universal appeals from this judgment, presenting a multifaceted attack on the trial court's findings. Plaintiffs cross-appeal, asserting that the present action should be considered a continuation of the lawsuit filed in 1963 for purposes of calculating the effect of the statute of limitations.

## II.   THE RIGHT OF PUBLICITY

The fundamental issue in this case is the nature of Lugosi's right to control the commercial exploitation of his likeness. The trial court found Universal's licensing agreements constituted a tortious interference with Lugosi's proprietary or property interest in the commercial

---

[7]The injunction entered by the trial court provides: "It is further Ordered, Adjudged and Decreed that said defendant Universal Pictures, a division of Universal City Studios, Inc., and each and all of said defendants affiliated and/or related corporations including MCA Entertainment, Inc., a corporation, MCA Enterprises, Inc., a corporation, The Danelectro Corporation, a corporation, Universal City Studios, Inc., MCA, Inc., other subsidiary corporations of MCA, Inc., and the officers, directors, employees and agents of said defendant and of each of its said affiliated and/or related corporations and each of them, and their respective successors, assigns and licensees, shall be and are hereby permanently enjoined and restrained from making or entering into any license or agreement of any kind or nature and however denominated which grants, authorizes, permits, consents to or licenses the name, likeness or appearance of Bela Lugosi, deceased, as Count Dracula on or in connection with the manufacture, distribution, sale, advertising or exploitation of any commercial merchandising products whatever; and from engaging in or participating with, by or through any other person, firm, partnership, joint venture, association or corporation in the manufacture, distribution, sale, advertising or other exploitation of Bela Lugosi's said name, likeness or appearance on or in connection with any commercial merchandising products whatever. The foregoing injunction does not apply or extend to the distribution, exhibition and broadcasting of the motion pictures entitled Dracula, Dracula's Daughter, Abbott and Costello Meet Frankenstein in theatres or on television and advertising in connection with the same, nor does said injunction apply or extend to any factually true biographical information about said decedent, Bela Lugosi, including comments and opinions thereon published, disseminated and communicated in any visual, audial, or audio-visual medium of expression."

use of his likeness, an interest which had descended to plaintiffs. Universal asserts that Lugosi's interest is protected only under the rubric of the right of privacy. Since that right is personal and ceased with Lugosi's death, plaintiffs cannot recover damages based on Universal's conduct.[8] Accordingly, the critical question is whether an individual's interest in the commercial use of his likeness is protected solely as an aspect of the right of privacy or whether additional or alternative protection exists.

## A. Privacy or Publicity

The common law right of privacy creates a cause of action for "an interference with the right of the plaintiff...'to be let alone.'" (Prosser, *Privacy* (1960) 48 Cal.L.Rev. 383, 389.)[9] "The gist of the cause of action in a privacy case is...a direct wrong of a personal character resulting in injury to the feelings...of the individual....The injury is mental and subjective. It impairs the mental peace and comfort of the person and may cause suffering much more acute than that caused by a bodily injury." (*Fairfield* v. *American Photocopy Equipment Co.* (1955) 138 Cal.App.2d 82, 86-87 [291 P.2d 194]. See *Gill* v. *Curtis Publishing Co.* (1952) 38 Cal.2d 273, 276-278 [239 P.2d 630]; Hofstadter & Horowitz, The Right of Privacy (1964) § 1.1; Warren & Brandeis, *The Right to Privacy* (1890) 4 Harv.L.Rev. 193.) Since the right of privacy developed to protect an individual from certain injuries to his feelings and assaults on his peace of mind, he need not suffer any injury to his property, business or economic interests as a prerequisite to initiating a suit for an invasion of privacy. (*Fairfield* v. *American Photocopy Equipment Co., supra,* 138 Cal.App.2d at p. 86.)

---

[8]It is not disputed that the right of privacy is a personal right, which is not assignable and ceases with an individual's death. (See, e.g., *Cain* v. *State Farm Mut. Auto. Ins. Co.* (1976) 62 Cal.App.3d 310, 313 [132 Cal.Rptr. 860]; *Hendrickson* v. *California Newspapers, Inc.* (1975) 48 Cal.App.3d 59, 62 [121 Cal.Rptr. 429]; *Werner* v. *Times-Mirror Co.*(1961) 193 Cal.App.2d 111, 116 [14 Cal.Rptr. 208]; *Kelly* v. *Johnson Publishing Co.* (1958) 160 Cal.App.2d 718, 721 [325 P.2d 659]. See generally Rest.2d Torts, § 652I; Prosser, Torts (4th ed. 1971) § 117, p. 802 et seq.; Annot., Right of Privacy (1950) 14 A.L.R.2d 750 and cases cited therein.) Thus, if the use of Lugosi's likeness in the sale of commercial products violated only Lugosi's right of privacy, such use after Lugosi's death would not entitle plaintiffs to any relief.

[9]A common law right of privacy has long been recognized by the courts of this state. (See, e.g., *Briscoe* v. *Reader's Digest Association, Inc.* (1971) 4 Cal.3d 529 [93 Cal.Rptr. 866, 483 P.2d 34, 57 A.L.R.3d 1]; *Coverstone* v. *Davies* (1952) 38 Cal.2d 315 [239 P.2d 876]; *; Melvin* v. *Reid* (1931) 112 Cal.App. 285 [297 P. 91].) In addition, the people of California have recently adopted a constitutional right to privacy. (Cal. Const., art. I, § 1.)

The appropriation of an individual's likeness for another's commercial advantage often intrudes on interests distinctly different than those protected by the right of privacy. Plaintiffs in this case have not objected to the manner in which Universal used Lugosi's likeness nor claimed any mental distress from such use. Rather, plaintiffs have asserted that Universal reaped an economic windfall from Lugosi's enterprise to which they are rightfully entitled.

Today, it is commonplace for individuals to promote or advertise commercial services and products or, as in the present case, even have their identities infused in the products. Individuals prominent in athletics, business, entertainment and the arts, for example, are frequently involved in such enterprises. When a product's promoter determines that the commercial use of a particular person will be advantageous, the promoter is often willing to pay handsomely for the privilege. As a result, the sale of one's persona in connection with the promotion of commercial products has unquestionably become big business. (See Note, *Lugosi v. Universal Pictures: Descent of the Right of Publicity* (1978) 29 Hastings L.J. 751; Nimmer, *The Right of Publicity* (1954) 19 Law & Contemp. Prob. 203, 204, 215-216; Treece, *Commercial Exploitation of Names, Likenesses, and Personal Histories* (1973) 51 Texas L.Rev. 637, 646.)

Such commercial use of an individual's identity is intended to increase the value or sales of the product by fusing the celebrity's identity with the product and thereby siphoning some of the publicity value or good will in the celebrity's persona into the product. This use is premised, in part, on public recognition and association with that person's name or likeness, or an ability to create such recognition. The commercial value of a particular person's identity thus primarily depends on that person's public visibility and the characteristics for which he or she is known. (*Uhlaender v. Hendricksen* (D.Minn. 1970) 316 F.Supp. 1277, 1283.)

Often considerable money, time and energy are needed to develop one's prominence in a particular field. Years of labor may be required before one's skill, reputation, notoriety or virtues are sufficiently developed to permit an economic return through some medium of commercial promotion. (See *Rosemont Enterprises, Inc. v. Urban Systems, Inc.* (1973) 72 Misc.2d 788 [340 N.Y.S.2d 144, 146], affd. as mod. 42 App.Div.2d 544 [345 N.Y.S.2d 17]; Nimmer, *supra,* 19 Law

& Contemp. Prob. at p. 216.) For some, the investment may eventually create considerable commercial value in one's identity.

In this context, the marketable product of that labor is the ability of a person's name or likeness to attract the attention and evoke a desired response in a particular consumer audience. That response is a kind of good will or recognition value generated by that person. (See *Ali* v. *Playgirl, Inc.* (S.D.N.Y. 1978) 447 F.Supp. 723, 728-729; *Grant* v. *Esquire, Inc.* (S.D.N.Y. 1973) 367 F.Supp. 876, 879.) While this product is concededly intangible, it is not illusory.

An unauthorized commercial appropriation of one's identity converts the potential economic value in that identity to another's advantage. The user is enriched, reaping one of the benefits of the celebrity's investment in himself. (See *Palmer* v. *Schonhorn Enterprises, Inc.* (1967) 96 N.J.Super. 72 [232 A.2d 458, 462]; Kalven, *Privacy in Tort Law —Were Warren and Brandeis Wrong?* (1966) 31 Law & Contemp. Prob. 326, 331.) The loss may well exceed the mere denial of compensation for the use of the individual's identity. The unauthorized use disrupts the individual's effort to control his public image, and may substantially alter that image. The individual may be precluded from future promotions in that as well as other fields. Further, while a judicious involvement in commercial promotions may have been perceived as an important ingredient in one's career, uncontrolled exposure may be dysfunctional. As a result, the development of his initial vocation —his profession—may be arrested. (See Treece, *supra,* 51 Texas L.Rev. at pp. 642-646.) Finally, if one's identity is exploited without permission to promote products similar to those which the individual has already endorsed, the unauthorized use resembles unfair competition. While the product which first used the celebrity paid for the privilege of trading on his publicity value, the second product has secured a costless endorsement. The simultaneous presence in the market of these competing products may cause the latter to be mistaken for the former and will probably diminish the value of the endorsement. (See *Factors Etc., Inc.* v. *Creative Card Co.* (S.D.N.Y. 1977) 444 F.Supp. 279, 283.)

Accordingly, the gravamen of the harm flowing from an unauthorized commercial use of a prominent individual's likeness[10] in most cases

---

[10]The present case indisputably involves the commercial use of the likeness of a prominent person. No opinion is expressed on whether the rights recognized herein apply to other individuals. (Compare *Ali* v. *Playgirl, Inc., supra,* 447 F.Supp. at p. 729 with Nimmer, *supra,* 19 Law & Contemp. Prob. at p. 217 and Treece, *supra,* 51 Texas L.Rev. at pp. 643, fn. 27, 644-645.)

is the loss of potential financial gain, not mental anguish. (See *Motschenbacher* v. *R. J. Reynolds Tobacco Co.* (9th Cir. 1974) 498 F.2d 821, 824; Prosser, *supra,* 48 Cal.L.Rev. at p. 406; Comment, *Transfer of the Right of Publicity: Dracula's Progency and Privacy's Stepchild* (1975) 22 UCLA L.Rev. 1103, 1104, fn. 8.)[11] The fundamental objection is not that the commercial use is offensive, but that the individual has not been compensated. Indeed, the representation of the person will most likely be flattering, since it is in the user's interest to project a positive image. The harm to feelings, if any, is usually minimal. (See Note, *Zacchini* v. *Scripps-Howard Broadcasting Company: Media Appropriation, the First Amendment and State Regulation* (1977) Utah L.Rev. 817, 818-819.)

The individual's interest thus threatened by most unauthorized commercial uses is significantly different than the personal interests protected under the right of privacy. Recognition of this difference has prompted independent judicial protection for this economic interest. The individual's interest in the commercial value of his identity has been regarded as proprietary in nature[12] and sometimes denominated a common law "right of publicity."[13] This right has won increasing judicial recognition,[14] as well as endorsements by legal

---

[11]This is not to suggest that commercial misappropriations of one's likeness may not inflict noneconomic injuries. Commercial misappropriations may injure a person's feelings in several ways. First, the person may find any commercial exploitation undesirable and offensive. Second, while certain commercial uses may be acceptable or even desirable, a particular use may be distressing. (See, e.g., *O'Brien* v. *Pabst Sales Co.* (5th Cir. 1942) 124 F.2d 167, 170.) Third, other individuals, unaware that the use is unauthorized, may disparage one who would sell their identity for that purpose, thereby inducing embarrassment, anger or mental distress. (See generally, Treece, *supra,* 51 Texas L.Rev. at pp. 638-648; Note, *Community Property Interests in the Right of Publicity: Fame and/or Fortune* (1978) 25 UCLA L.Rev. 1095, 1108-1109.) Further, any unauthorized use infringes on one's effort to control the public projection of one's identity, including the desire for solitude and anonymity.

[12]As one court observed nearly 70 years ago in recognizing the need to accord protection to the economic value in one's identity: "If there is value in [one's likeness], sufficient to excite the cupidity of another, why is it not the property of him who gives it the value and from whom the value springs?" (*Munden* v. *Harris* (1911) 153 Mo.App. 652 [134 S.W. 1076, 1078].)

[13]*Haelan Laboratories, Inc.* v. *Topps Chewing Gum, Inc.* (2d Cir. 1953) 202 F.2d 866, 868; Nimmer, *supra,* 19 Law & Contemp. Prob. 203.

[14]See, e.g., *Factors Etc., Inc.* v. *Pro Arts, Inc.* (2d Cir. 1978) 579 F.2d 215, 221; *Ali* v. *Playgirl, Inc. supra,* 447 F.Supp. at pages 728-729; *Zacchini* v. *Scripps-Howard Broadcasting Co.* (1977) 433 U.S. 562, 575-578 [53 L.Ed.2d 965, 975-978, 97 S.Ct. 2849]; *Factors Etc., Inc.* v. *Creative Card Co., supra,* 444 F.Supp. at page 282; *Memphis Development Foundation* v. *Factors Etc., Inc.* (W.D.Tenn. 1977) 441 F.Supp. 1323, 1330, affirmed (6th Cir. 1978) 578 F.2d 1381; *Lombardo* v. *Doyle, Dane & Bernbach, Inc.* (1977) 58 App.Div.2d 620 [396 N.Y.S.2d 661, 664]; *Rosemont Enter-*

commentators.[15]

The right of publicity has been regarded as "the right of each person to control and profit from the publicity values which he has created or purchased." (Nimmer, *supra,* 19 Law & Contemp. Prob. at p. 216. See Note, *supra,* 25 UCLA L.Rev. at p. 1097.) "The distinctive aspect of the common law right of publicity is that it recognizes the commercial value of the picture or representation of a prominent person or performer, and protects his proprietary interest in the profitability of his public reputation or 'persona.'" (*Ali* v. *Playgirl, Inc., supra,* 447 F.Supp. at p. 728.) Two leading decisions are illustrative.

prises, Inc. v. *Urban Systems, Inc., supra,* 72 Misc.2d 788 [340 N.Y.S.2d at page 146], affirmed as modified 42 App.Div.2d 544 [345 N.Y.S.2d 17]; *Grant* v. *Esquire, Inc., supra,* 367 F.Supp. at page 880; *Uhlaender* v. *Hendricksen, supra,* 316 F.Supp. at pages 1280-1283; *Cepeda* v. *Swift & Co.* (8th Cir. 1969) 415 F.2d 1205, 1206; *McQueen* v. *Wilson* (1968) 117 Ga.App. 488 [161 S.E.2d 63, 65-66], reversed on other grounds 224 Ga. 420 [162 S.E.2d 313]; *Canessa* v. *J. I. Kislak, Inc.* (1967) 97 N.J.Super. 327 [235 A.2d 62, 75-76]; *Hogan* v. *A. S. Barnes & Co., Inc.* (Pa. Ct. C.P. Phil.Cy. 1957) 114 U.S. P. Q. 314 (discussed in Note, *The Right of Publicity—Protection for Public Figures and Celebrities* (1976) 42 Brooklyn L.Rev. 527, 535-536); *Ettore* v. *Philco Television Broadcasting Corp.* (3d Cir. 1956) 229 F.2d 481, 487, 489-492; *Haelan Laboratories, Inc.* v. *Topps Chewing Gum, Inc., supra,* 202 F.2d at page 868; *U.S. Life Ins. Co.* v. *Hamilton* (Tex.Civ.App. 1951) 238 S.W.2d 289, 292; *O'Brien* v. *Pabst Sales Co., supra,* 124 F.2d at page 170 (dis. opn. of Holmes, J.); *Munden* v. *Harris, supra,* 134 S.W. at page 1079; *Edison* v. *Edison Polyform Mfg. Co.* (1907) 73 N.J.Eq. 136 [67 A. 392].

Despite this increasing trend toward recognizing a distinct right to control the commercial exploitation of one's name and likeness, the development of this right has been spasmodic. This is in part a consequence of courts adjudicating claims which might be categorized as invasions of plaintiff's right of publicity as privacy claims. (See cases cited in fn. 20, *post.*) The resulting confusion often noted by commentators, has impeded the development of the right. (See, e.g., Note, *supra,* 29 Hastings L.J. at pp. 752-754; Gordon, *Right of Property in Name, Likeness, Personality and History* (1960) 55 Nw. U.L.Rev. 553, 554, 606 et seq.; Note, *supra,* 42 Brooklyn L.Rev. at pp. 527, 540-541.)

This confusion is due, in part, to the failure of litigants to delineate carefully the nature of the interest sought to be vindicated. However, a certain amount of equivocation is not surprising when the right of publicity is discussed as a variety of the right of privacy, a personal right, and then promptly described as a property right. The Restatement Second of Torts, for example, discusses the appropriation of a person's name or likeness under the rubric of the right of privacy. (§ 652C.) That right is deemed to be personal and nonassignable and to terminate upon death. (§ 652I.) However, the Restatement Second also states that the protection "appears...to confer something analogous to a property right upon the individual" (§ 652A, com. b), that the right to use one's name is assignable (§ 652C, com. a), and that survival rights may be held to exist (§ 652I, com. b).

[15]See, e.g., Note, *supra,* 29 Hastings L.J. at page 754; Note, *supra,* 25 UCLA L.Rev. at pages 1096, 1102-1109; Comment, *Privacy, Appropriation, and the First Amendment: A Human Cannonball's Rather Rough Landing* (1977) B.Y.U.L.Rev. 579, 587; Note, *supra,* 42 Brooklyn L.Rev. at page 545; Pember & Teeter, *Privacy and the Press since Time, Inc. v. Hill* (1974) 50 Wash.L.Rev. 57, 87-88; Treece, *supra,* 51

In *Haelan Laboratories, Inc.* v. *Topps Chewing Gum, Inc., supra,* 202 F.2d 866, plaintiff, which had an exclusive contract with a baseball player to use the player's photograph in connection with the sale of plaintiff's chewing gum, sued to prevent defendant's similar use of the player's photograph. The viability of plaintiff's lawsuit depended on the court's determination of the player's interest in his own likeness: if the player's interest consisted only of the right of privacy, plaintiff could not maintain its action since the player's right was incapable of assignment.

Applying New York law, the federal court of appeals found that in addition to a statutory right to privacy, each person had an enforceable right in the publicity value of his photograph, a "right of publicity." Unlike the personal right of privacy, such interest could be transferred "'in gross,' i.e., without any accompanying transfer of a business or of anything else. . . . [¶] . . . For it is common knowledge that many prominent persons (especially actors and ball-players), far from having their feelings bruised through public exposure of their likenesses, would feel sorely deprived if they no longer received money for authorizing advertisements, popularizing their countenances, displayed in newspapers, magazines, busses, trains and subways. This right of publicity would usually yield them no money unless it could be made the subject of an exclusive grant which barred any other advertiser from using their pictures." (*Id.,* at p. 868.) Accordingly, the court held that plaintiff's claim had been improperly dismissed.

*Price* v. *Hal Roach Studios, Inc.* (S.D.N.Y. 1975) 400 F.Supp. 836 involved a controversy remarkably similar to the present case. Plaintiffs were the widows of Stanley Laurel and Oliver Hardy (Laurel and Hardy) and a corporation with a contract for the exclusive right to use and merchandise Laurel's and Hardy's names, likenesses and characterizations. Plaintiffs alleged that defendants, owners of the copyright to certain Laurel and Hardy motion pictures, had misappropriated the names and likenesses of the two deceased comedians for commercial merchandising purposes. The court, citing *Haelan*, held that Laurel and Hardy had had a property right in the use of their names and likenesses during their lifetimes completely separate from the right of privacy. Further, their right of publicity was held to descend to their respective wives upon death, without regard to whether either exploited his right to publicity during his lifetime. (*Id.,* at pp. 843-844, 846.)[16] According-

Texas L.Rev. at pages 647-648; Hofstadter & Horowitz, *supra,* section 1.4, pages 6-7; Gordon, *supra,* 55 Nw.U.L.Rev. 553.

[16]The court's thoughtful analysis reflects an understanding of the distinctions be-

ly, notwithstanding defendants' interest in certain Laurel and Hardy motion pictures, plaintiffs were held to be entitled to damages and injunctive relief for defendants' unauthorized commercial use of Laurel's and Hardy's rights of publicity.

Underlying these decisions is a recognition that each person has a "right to enjoy the fruits of his own industry," the right to decide how and when the commercial value in his identity will be exploited. (*Uhlaender* v. *Hendricksen, supra,* 316 F.Supp. at p. 1282. See Nimmer, *supra,* 19 Law & Contemp. Prob. at p. 216; Note, *supra,* 1977 Utah L.Rev. at p. 818.)[17] When one makes an unauthorized use of another's identity for his own commercial advantage, he is unjustly enriched, having usurped both profit and control of that individual's public image.[18]

Further, there is a broader social objective implicit in according judicial protection to the right of publicity, analogous to the policies underlying copyright and patent law. The Supreme Court recently described the purpose of granting copyright protection as encouraging "people to devote themselves to intellectual and artistic creation...," and thereby secure the benefits of such labors for the entire society.

---

tween the right of publicity and the right of privacy. "While much confusion is generated by the notion that the right of publicity emanates from the classic right of privacy, the two rights are clearly separable. The protection from intrusion upon an individual's privacy, on the one hand, and protection from appropriation of some element of an individual's personality for commercial exploitation, on the other hand, are different in theory and in scope.

". . . . . . . . . . .

"Since the theoretical basis for the classic right of privacy, and of the statutory right in New York, is to prevent injury to feelings, death is a logical conclusion to any such claim. In addition, based upon the same theoretical foundation, such a right of privacy is not assignable during life. When determining the scope of the right of publicity, however, one must take into account the purely commercial nature of the protected right. Courts and commentators have done just that in recognizing the right of publicity as assignable. There appears to be no logical reason to terminate this right upon death of the person protected. It is for this reason, presumably, that this publicity right has been deemed a 'property right.'" (Fns. omitted.) (*Id.,* at pp. 843, 844.)

[17]In *Uhlaender* v. *Hendricksen, supra,* 316 F.Supp. at page 1282, the court held ". . . that a celebrity has a legitimate proprietary interest in his public personality. A celebrity must be considered to have invested his years of practice and competition in a public personality which eventually may reach marketable status. That identity, embodied in his name, likeness, statistics and other personal characteristics, is the fruit of his labors and is a type of property."

[18]Implicit in affording an individual the right to control the commercial exploitation of his or her name and likeness is the right to limit or entirely prevent such use. Such limitation may be motivated by an effort to husband the value or by a refusal to allow the use of one's identity to promote the sale of commercial products. Thus, recognition of the right provides protection as well for an individual's interest in not being subjected to commercial exploitation. (See generally, fn. 11, *ante.*)

(*Goldstein* v. *California* (1973) 412 U.S. 546, 555 [37 L.Ed.2d 163, 173, 93 S.Ct. 2303]. See 1 Nimmer on Copyright (1978) § 1.03[A].) Similarly, providing legal protection for the economic value in one's identity against unauthorized commercial exploitation creates a powerful incentive for expending time and resources to develop the skills or achievements prerequisite to public recognition and assures that the individual will be able "to reap the reward of his endeavors...." (*Zacchini* v. *Scripps-Howard Broadcasting Co., supra,* 433 U.S. at p. 573 [53 L.Ed.2d at p. 975].) While the immediate beneficiaries are those who establish professions or identities which are commercially valuable, the products of their enterprise are often beneficial to society generally. Their performances, inventions and endeavors enrich our society, while their participation in commercial enterprises may communicate valuable information to consumers. (See *id.,* at pp. 576-577 [53 L.Ed.2d at pp. 976-977]; Note, *supra,* 29 Hastings L.J. at pp. 767-768; Note, *Human Cannonballs and the First Amendment: Zachini* v. *Scripps-Howard Broadcasting* Co. (1978) 30 Stan.L.Rev. 1185, 1186, fn. 7.)[19]

The reasons for affording independent protection for the economic value in one's identity are substantial and compelling, as attested by the increasing number of jurisdictions which have done so. (See fn. 14, *ante.*)[20] I am similarly persuaded that an individual's right of publicity

---

[19]One commentator has suggested a related benefit which may flow from recognizing an individual's right of publicity: "The use of celebrities' names and pictures appears to be a characteristic of advertising. Advertisers would probably continue to use celebrities' pictures even if they knew that other advertisers could freely make similar use of the same names and pictures. In other words, if free use of names and pictures developed, they would probably continue to attract the consumer's attention, provoke emulation, and, perhaps, suggest sponsorship. If society chooses to allow uses of names and likenesses in advertising, it might prefer that consumers not be misled about the willingness of a celebrity to associate himself with a product or service. It might give celebrities a cause of action for unconsented uses of names and likenesses in furtherance of that objective. Similarly, society might decide that the 'emulating' behavior of consumers would channel itself more acceptably if the persons emulated had some control over the decision to link their names and likenesses with particular products. Indeed, persons whose personalities attract consumers might find that coercing advertisers to forego some forms of undesirable advertising behavior advances their interests. Allowing individuals to control the advertising use of their personalities could thus provide a private law mechanism for advertising regulation." (Treece, *supra,* 51 Texas L.Rev. at p. 647, fn. omitted.)

[20]Universal relies on decisions from several jurisdictions for its contention that an appropriation of one's name or likeness is only protected under the right of privacy. Such reliance is misplaced. In several cases, the court reached its result under the principles governing the right of privacy because the plaintiff had based its claim on an invasion of that right. (See, e.g., *Maritote* v. *Desilu Productions, Inc.* (7th Cir. 1965) 345 F.2d 418, 420 ["...all of the relief sought by the several plaintiffs is essentially for a

is entitled to the law's protection.[21]

The common law can readily accommodate judicial recognition of the right of publicity. "'The rules of the common law are continually changing and expanding with the progress of the society in which it prevails. It does not lag behind, but adapts itself to the conditions of the present so that the ends of justice may be reached.'" (*Johnston* v. *20th Century-Fox Film Corp.* (1947) 82 Cal.App.2d 796, 815 [187 P.2d 474].) Specifically, this court has long recognized that the concept of "property" is not static but changes to accommodate creative developments and novel legal relationships.[22] For example, courts have recognized protectible interests in trademarks (*Derringer* v. *Plate* (1865) 29 Cal. 292, 294-295; *Hall* v. *Holstrom* (1930) 106 Cal.App. 563, 568 [289 P. 668]), titles of literary works (*Jackson* v. *Universal International Pictures, Inc.* (1950) 36 Cal.2d 116 [222 P.2d 433]; *Johnston* v. *20th*

claimed invasion of a right of privacy." (Fn. omitted)]; *Gruschus* v. *Curtis Publishing Co.* (10th Cir. 1965) 342 F.2d 775; *O'Brien* v. *Pabst Sales Co., supra,* 124 F.2d 167.) In *Miller* v. *C. I. R.* (2d Cir. 1962) 299 F.2d 706, 708, the court expressly limited its discussion to definitions applicable to federal income tax law. In *Schumann* v. *Loew's, Incorporated* (Sup. 1954) 135 N.Y.S.2d 361, 369, a New York trial court rejected the assertion that a great-grandchild of a prominent person could recover for the unauthorized use of that person's name in a motion picture produced many years after that person's death. Beyond the obvious distinctions between that case and the present matter, the continuing significance of that decision is unclear since New York courts have subsequently recognized a proprietary interest in one's name. (See cases cited in fn. 14, *ante.*)

[21]Universal's assertion that prior California decisions have reached a contrary conclusion is mistaken. Although the underlying facts in *Fairfield* v. *American Photocopy Equipment Co., supra,* 138 Cal.App.2d 82 and *James* v. *Screen Gems, Inc.* (1959) 174 Cal.App.2d 650 [344 P.2d 799] might have supported a cause of action based on a proprietary interest in the names used, both courts adopted the parties' characterizations of the actions as involving the right of privacy and applied principles governing privacy actions. Similarly, the courts in *Williams* v. *Weisser* (1969) 273 Cal.App.2d 726 [78 Cal.Rptr. 542, 38 A.L.R.3d 761] and *Stilson* v. *Reader's Digest Assn. Inc.* (1972) 28 Cal.App.3d 270 [104 Cal.Rptr. 581] expressly adopted the analytic framework established in *Fairfield* in evaluating the appropriation of the plaintiff's name in each case. It does not appear that the plaintiff in either case seriously pursued recovery based on an invasion of a property right. However, one legal commentator identified two California trial courts which *did* recognize the property interest involved. (Gordon, *supra,* 55 Nw.U.L.Rev. at p. 587, fn. 152. Cf. *Motschenbacher* v. *R. J. Reynolds Tobacco Co., supra,* 498 F.2d at p. 825 [finding that California courts would protect, regardless of the rubric adopted, "an individual's proprietary interest in his own identity"].)

[22]"'The term "property" is sufficiently comprehensive to include every species of estate, real and personal, and everything which one person can own and transfer to another. It extends to every species of right and interest capable of being enjoyed as such upon which it is practicable to place a money value.'" (*Yuba River Power Co.* v. *Nevada Irrigation District* (1929) 207 Cal. 521, 523 [279 P. 128]. See *White* v. *Kimmel* (S.D.Cal. 1950) 94 F.Supp. 502, 504, revd. on other grounds 193 F.2d 744; Civ. Code, §§ 654, 655. Cf. Warren & Brandeis, *supra,* 4 Harv.L.Rev. at pp. 193-195.)

*Century-Fox Films Corp., supra,* 82 Cal.App.2d 796), the collection and dissemination of news (*International News Service* v. *Associated Press* (1918) 248 U.S. 215 [63 L.Ed. 211, 39 S.Ct. 68, 2 A.L.R. 293]), and ideas communicated in confidence or in reasonable expectation of consideration (see *Davies* v. *Krasna* (1975) 14 Cal.3d 502, 506, fn. 3 [121 Cal.Rptr. 705, 535 P.2d 1161, 79 A.L.R.3d 807] [cases collected]; *Components For Research, Inc.* v. *Isolation Products, Inc.* (1966) 241 Cal.App.2d 726, 730 [50 Cal.Rptr. 829]). The right of publicity is entitled to similar treatment.[23] (See Nimmer, *supra,* 19 Law & Contemp. Prob. at p. 223.)

---

[23]The Legislature recently enacted Civil Code Section 3344 to provide a minimum amount of damages where an unauthorized commercial appropriation constitutes an invasion of privacy. The Legislature's creation of this statutory remedy evidences its concern with commercial misappropriations of an individual's identity, and thereby reinforces the propriety of recognizing common law protection in the related area of the right of publicity.

Section 3344 provides: "(a) Any person who knowingly uses another's name, photograph, or likeness, in any manner, for purposes of advertising products, merchandise, goods or services, or for purposes of solicitation of purchases of products, merchandise, goods or services, without such person's prior consent, or, in the case of a minor, the prior consent of his parent or legal guardian, shall be liable for any damages sustained by the person or persons injured as a result thereof. In addition, in any action brought under this section, the person who violated the section shall be liable to the injured party or parties in an amount no less than three hundred dollars ($300).

". . . . . . . . . . . . .

"(g) The remedies provided for in this section are cumulative and shall be in addition to any others provided for by law."

The legislative history of section 3344 strongly suggests that the Legislature was concerned with an individual's right to privacy, not an individual's proprietary interest in his or her name and likeness. The Assembly Judiciary Committee's analysis, the Legislative analysis and the Legislative Counsel's Digest of Assembly Bill No. 826 (1971 Reg. Sess.), which became section 3344, all characterized the problem presented as an "invasion of privacy." (See, e.g., Assem. Jud. Com., Analysis of Assem. Bill No. 826 (Vasconcellos) as amended (1971 Reg. Sess.) (June 14, 1971) p. 1. See also *Stilson* v. *Reader's Digest Assn., Inc., supra,* 28 Cal.App.3d at p. 273.) As the bill's author explained, "[t]his bill fills a gap which exists in the common law tort of *invasion of privacy* in the state of California": to provide a minimum amount of damages for the invasion of the "little man['s]" privacy occasioned by an unauthorized commercial use. "[I]t becomes imperative that the law be equipped to provide some sort of protection to the individual citizen from *an invasion of his privacy.*This bill provides a simple, civil remedy for the injured individual." (Letter from Assemblyman Vasconcellos to Governor Reagan recommending Assem. Bill No. 826 for his signature (Nov. 10, 1971) italics added.) In contrast to these numerous references to the right of privacy, there is no mention in the legislative documents of the right of publicity or the economic interest protected thereunder.

In this context, it is consistent with the common law limitation on the right to privacy for the statute not to provide for an action by one's heirs. (See maj. opn., *ante,* p. 819, fn. 6.) However, such a limitation is irrelevant in establishing the parameters of the distinctive common law right of publicity. Moreover, the Legislature unequivocally established in subdivision (g) that this statutory remedy be in addition to any other remedies provided for by law and thus would coexist with related common law actions,

Universal argues that judicial recognition of an independent right of publicity is unnecessary in light of the adequate protection afforded under the common law right of privacy. However, the interest at stake in most commercial appropriation cases is ill-suited to protection under the umbrella of the right of privacy. First, the *raison d'etre* of the common law right of privacy is protection against assaults on one's feelings; an unauthorized commercial appropriation usually precipitates only economic loss, not mental anguish.[24] Second, since the representation of the individual is often flattering, substantial linguistic acrobatics are required to construct a privacy claim on the ground that the use is offensive to a reasonable person. (See Note, *supra,* 1977 Utah L.Rev. at pp. 818-819. Cf. *Briscoe* v. *Reader's Digest Association, Inc., supra,* 4 Cal.3d at pp. 541, 543.) Third, if information about a person is already in the public domain, there can be no claim for an invasion of privacy; to that extent, the right of privacy has been waived. Yet it is publicity which frequently creates value in the individual's identity. To deny a claim for damages for commercial misappropriation because the claimant is prominent is to deny the right to the very individuals to whom the right is most valuable.[25] Fourth, if treated as an aspect of privacy, the use of one's identity for commercial purposes may not be assigned because privacy is a personal, nonassignable right. (See fn. 8, *ante.*) Such a limitation precludes transferring this economic interest, thereby substantially diminishing its value. (See Nimmer, *supra,* 19 Law & Contemp. Prob. at pp. 209-210; *Haelan Laboratories, Inc.* v. *Topps Chewing Gum, Inc., supra,* 202 F.2d at p. 868.) In short, conforming a claim for the misappropriation of the commercial value in one's identity to the requirements of the right of privacy requires a procrustean jurisprudence.

---

including an action for the infringement of the right of publicity. (See Weinstein, *Commercial Appropriation of Name and Likeness: Section 3344 and The Common Law* (1977) 52 L.A. Bar J. 430, 432-433, 435, 454-455.)

[24]This fundamental distinction is not undercut because a genuine invasion of privacy may also result in pecuniary loss. For example, the publication of previously private information may result in an economic loss if a client of the injured party severs their relationship in light of that publication. The direct harm is injury to feelings, the economic loss being entirely derivative. In contrast, the unauthorized use of one's name for commercial purposes inflicts a direct financial loss. In addition, the injured party's economic loss in a privacy action rarely benefits the tortfeasor. By definition, an appropriation is intended to benefit the person improperly using the name or likeness. Finally, a person need not suffer any economic harm to state a claim for an invasion of privacy; in contrast, economic loss is the essence of an action based on a misappropriation for commercial purposes. (See *Uhlaender* v. *Hendricksen, supra,* 316 F.Supp. at p. 1280; Comment, *supra,* 22 UCLA L.Rev. at pp. 1103-1104; Prosser, *supra,* 48 Cal. L.Rev. at p. 406; Note, *supra,* 29 Hastings L.J. at p. 754.)

[25]See Nimmer, *supra,* 19 Law & Contemp. Prob. at pages 204-206; Note, *supra,* 25

### B. The Scope of the Right of Publicity

The parameters of the right of publicity must now be considered. This case presents two questions: (1) whether the right extends to the likeness of an individual in his portrayal of a fictional character; and (2) whether the right dies with the individual or may be passed to one's heirs or beneficiaries.

Because the right protects against the unauthorized commercial use of an individual's identity, the right clearly applies to the person's name and likeness. However, such protection would appear to be insufficient because many people create public recognition not only in their "natural" appearance but in their portrayal of particular characters. Charlie Chaplin's Little Tramp, Carroll O'Connor's Archie Bunker and Flip Wilson's Judge and Geraldine exemplify such creations. Substantial publicity value exists in the likeness of each of these actors in their character roles. The professional and economic interests in controlling the commercial exploitation of their likenesses while portraying these characters are identical to their interests in controlling the use of their own "natural" likenesses. Indeed, to the extent one's professional endeavors have focused on the development of one or more particular character images, protection for one's likeness in the portrayal of those characters may well be considerably more important than protection for the individual's "natural" appearance. Hence, there appears to be no reason why the right of publicity should not extend to one's *own* likeness while portraying a particular fictional character.[26]

Lugosi's likeness in his portrayal of Count Dracula is clearly such a case. Many men have portrayed Count Dracula in motion pictures and on stage. However, the trial court found that Universal did not license the use of an undifferentiated Count Dracula character, but the distinctive and readily recognizable portrayal of Lugosi as the notorious Translyvanian count. Universal thereby sought to capitalize on the particular image of Lugosi in this portrayal of Count Dracula and the

---

UCLA L.Rev. at page 1107. Cf. *Uhlaender* v. *Hendricksen, supra,* 316 F.Supp. at page 1283.

[26]This protection extends only to the individual's likeness—a representation or image of the person—while portraying the particular character. Nothing herein is intended to extend protection to the idea for the character or to the character itself. Nothing in the right of publicity prohibits another person, for example, from developing and playing a sympathetic tramp character similar to the one portrayed by Chaplin.

public recognition generated by his performance. Such use is illustrative of the very interests the right of publicity is intended to protect. Hence, Lugosi had a protectible property interest in controlling unauthorized commercial exploitation of *his* likeness in his portrayal of Count Dracula.

Recognizing Lugosi's legitimate interest in controlling the use of his portrayal of Count Dracula limits neither the author's exploitation of the novel Dracula[27] nor Universal's use of its copyrighted motion picture. Lugosi only agreed to allow Universal to make limited use of his likeness in their 1930 contract. Further, Lugosi's right certainly does not prohibit others from portraying the character Count Dracula. Consequently, nothing established herein suggests that any of the individuals involved in contemporary cinematic or theatrical revivals of Count Dracula's nocturnal adventures have violated Lugosi's right of publicity. The only conduct prohibited is the unauthorized commercial use of *Lugosi's likeness* in his portrayal of Count Dracula. To the extent that Universal or another seeks such use, that right can be secured by contract.[28]

The right of publicity protects the intangible proprietary interest in the commercial value in one's identity. Like other intangible property rights, its value often cannot be reaped if the individual may not transfer all or part of that interest to another for development. Indeed, an exclusive grant of publicity rights may be required before an attempt to use or promote that person's likeness will be undertaken. Since it is clear that the right of publicity is hardly viable unless assignable, I agree with the numerous authorities that have recognized the right is capable of assignment.[29]

---

[27]This case does not present the question of the relative rights of the novel's copyright holder and Lugosi and his heirs in commercial exploitations of Lugosi's likeness in his portrayal of Count Dracula. However, it should be noted that the trial court found that the novel Dracula has always been in the public domain in the United States due to the author's failure to comply with a requirement of the copyright law in existence when the novel was published.

[28]Where the portrayal of a fictional character is the product of a joint enterprise, the respective rights of the parties can be established by contract. The contractual relationship between Lugosi and Universal is detailed in section III, *post.*

[29]See, e.g., *Factors Etc., Inc.* v. *Pro Arts, Inc., supra,* 579 F.2d at page 221; *Cepeda* v. *Swift & Co., supra,* 415 F.2d at page 1206; *Haelan Laboratories, Inc.,* v. *Topps Chewing Gum, Inc., supra,* 202 F.2d at page 868; Prosser, Torts (4th ed. 1971) section 117, page 807; Gordon, *supra,* 55 Nw.U.L.Rev. at page 611; Nimmer, *supra,* 19 Law & Contemp. Prob. at page 216.

It is equally clear that the right may be passed to one's heirs or beneficiaries upon the individual's death. In considering the question of the right's descendibility, it must be remembered that what is at issue is the *proprietary* interest in the value of one's name and likeness in commercial enterprises, not a personal right like the right of privacy. No policy has been suggested which persuades me that the right of publicity "...should not descend at death like any other intangible property right." (*Factors Etc., Inc. v. Creative Card Co., supra,* 444 F.Supp. at p. 284.) Further, as with copyright protection, granting protection after death provides an increased incentive for the investment of resources in one's profession, which may augment the value of one's right of publicity. If the right is descendible, the individual is able to transfer the benefits of his labor to his immediate successors and is assured that control over the exercise of the right can be vested in a suitable beneficiary. "There is no reason why, upon a celebrity's death, advertisers should receive a windfall in the form of freedom to use with impunity the name or likeness of the deceased celebrity who may have worked his or her entire life to attain celebrity status. The financial benefits of that labor should go to the celebrity's heirs...." (Note, *supra,* 42 Brooklyn L.Rev. at p. 547.)[30]

However, encouraging the investment of resources in activities and careers from which publicity values arise and providing protection for the resulting proprietary interest does not necessitate perpetual protection for the right of publicity. Assurance that one's immediate family and successors will be entitled to the residual value of one's right of publicity after death is a sufficient incentive. Further, recognition of the right of publicity is premised in part on an individual's interest in controlling the manner in which he or she is commercially exploited, so that such use furthers rather than undermines his or her professional

---

[30]Those decisions which have considered whether the right of publicity survives death have ruled in favor of its inheritability. (See, e.g., *Factors Etc., Inc. v. Pro Arts, Inc., supra,* 579 F.2d at pp. 221-222; *Factors Etc., Inc. v. Creative Card Co., supra,* 444 F.Supp. at pp. 282, 284; *Memphis Development Foundation v. Factors, Etc., Inc., supra,* 441 F.Supp. at p. 1330; *Price v. Hal Roach Studios, Inc., supra,* 400 F.Supp. at p. 844; *Shaw v. United Artists Corp.* (E.D. Ill.) 54 C 290 (unreported, discussed in Gordon, *supra,* 55 Nw.U.L.Rev. at p. 600).) This result has been approved by numerous legal commentators. (See, e.g., Note, *supra,* 29 Hastings L.J. at pp. 767-768; Note, *supra,* 42 Brooklyn L.Rev. at pp. 541-547; Note, *Why Not A Relational Right of Privacy—Or Right of Property?* (1973) 42 Mo.—Kansas City L.Rev. 175, 183; Sobel, *Count Dracula and the Right of Publicity* (1972) 47 L.A. Bar Bull. 373, 375-376; Donenfeld, *Property or Other Rights in the Names, Likenesses or Personalities of Deceased Persons* (1968) 16 Bull. Copyright Soc'y. 17; Gordon, *supra,* 55 Nw.U.L.Rev. at pp. 598-599, 612-613.)

activities. With death, the *individual's* need to control the commercial uses of his identity as an adjunct to his career ceases. Providing legal protection long after death basically serves to protect the continuing exploitation of the right, a protection which may already be available under the theory of unfair competition. (See maj. opn., *ante,* pp. 818-819. See generally, Fields, *What's in a Stage Name?* (1962) 35 So. Cal.L.Rev. 149, 149-154.) Finally, with the passage of time, an individual's identity is woven into the fabric of history, as a heroic or obscure character of the past. In that sense, the events and measures of his life are in the public domain and are questionably placed in the control of a particular descendent.

The fixing of the precise date for the termination of the right of publicity is inherently a policy decision, one that the Legislature may be best able to determine. However, in the absence of legislative action, a limit must be prescribed. In fashioning common law rights and remedies in the past, this court has often considered federal and state statutory schemes for guidance. (See, e.g., *In re Waltreus* (1965) 62 Cal.2d 218, 224 [42 Cal.Rptr. 9, 397 P.2d 1001]; *Estate of Mason* (1965) 62 Cal.2d 213, 217 [42 Cal.Rptr. 13, 397 P.2d 1005].) Since the right of publicity recognizes an interest in intangible property similar in many respects to creations protected by copyright law (*Zacchini v. Scripps-Howard Broadcasting Co., supra,* 433 U.S. at p. 573 [53 L.Ed.2d at p. 975]), that body of law is instructive.

The Copyright Act of 1976 (17 U.S.C. § 101 et seq.) provides that a copyright in new works shall be recognized during the author's life and for 50 years thereafter. (17 U.S.C. § 302 (a).) That period represents a reasonable evaluation of the period necessary to effect the policies underlying the right of publicity. Therefore, I would hold that the right of publicity should be recognized during the subject's life and for 50 years thereafter. (See Comment, *supra,* 22 UCLA L.Rev. at pp. 1124-1128; Note, *supra,* 29 Hastings L.J. at p. 773. Cf. Nimmer, *Does Copyright Abridge the First Amendment Guarantees of Free Speech and Press?* (1970) 17 UCLA L.Rev. 1180, 1193-1194.)[31]

---

[31] Universal asserts that the recognition of any right after death will deluge the courts with trivial and specious complaints concerning the use of the names of long-dead notables, e.g., Henry VIII. This argument is unpersuasive. The statutes of limitations, the absolute limitation on the duration of the right, and the difficulties of proving ownership of that right, not mere descendency, will provide ample barriers to stale claims. (See Gordon, *supra,* 55 Nw.U.L.Rev. at p. 601; Sobel, *supra,* 47 L.A. Bar Bull. at pp. 403-404.)

The final question presented is whether an individual must exercise the right of publicity during his or her lifetime as a condition of its inheritability. The weight of authority holds that an individual need *not* exercise one's right of publicity "to protect it from use by others or to preserve any potential right of one's heirs." (*Price* v. *Hal Roach Studios, Inc., supra,* 400 F.Supp. at p. 846.)[32] A person may not have commercially exploited his name or likeness during his lifetime due to the absence of the appropriate medium or an early death. Perhaps the individual chose not to exercise the right to retain its full value as a legacy for his heirs. Since those choices do not conflict with the rationale for recognizing the right, the failure to exercise the right should not affect its inheritability.

Further, there is no reasonable method for ascertaining in a particular case if the right has been sufficiently exploited to warrant passing the right to the decedent's beneficiaries. There are no practical standards for measuring which uses and what period of use are required to create a protectible right. Absent clear rules, the right of publicity might be lost by the unwary. Hence, requiring the exercise of the right of publicity during the person's lifetime as a condition for inheritability is not only inconsistent with the rationale underlying the right but imposes an ill-defined prerequisite on its preservation.[33]

In summary, I would hold that a prominent person's interest in the economic value of commercial uses of his or her name and likeness is protected under the common law. This interest is denominated a right

---

[32]See *Grant* v. *Esquire, Inc., supra,* 367 F.Supp. at page 880; *Munden* v. *Harris, supra,* 134 S.W. at page 1078; Note, *supra,* 29 Hastings L.J. at pages 764-766. But see *Factors Etc., Inc.* v. *Pro Arts, Inc., supra,* 579 F.2d at page 222, footnote 11.

[33]The majority would appear to have concluded that an individual's right of publicity may be exploited after his death if exercised or assigned by the individual during his lifetime. (See maj. opn., *ante,* pp. 819-820, 823.) As explained in the text, such a proposition is illogical. It is particularly unpersuasive under the facts of this case.

Actors, like Lugosi, continually exploit their popularity through the medium of their profession. They and their employers consciously trade on the public's interest in and recognition of them. In this case, as the majority recognize, Lugosi granted Universal the right to make limited use of his likeness, as both parties sought to profit from his portrayal of Count Dracula. Under the majority's analysis, such conduct would be sufficient for Universal to exploit Lugosi's right of publicity after Lugosi's death as it did in the subject licensing agreements, if Lugosi had granted Universal merchandising rights in their contract. Yet, such conduct is incongruously insufficient for Lugosi to retain such rights for his heirs. Once assigned to Universal, Lugosi's right of publicity may remain dormant until a suitable medium and setting is found. But the majority would deny Lugosi the right to retain his interest in his own likeness undeveloped as a legacy for his heirs. Such a distinction is wholly unjustified.

of publicity and is assignable. The right is descendible and is accorded legal protection during the individual's lifetime and for a period of 50 years thereafter. Having found Universal licensed Lugosi's likeness in his distinctive portrayal of Count Dracula, the trial court properly held such use infringed on Lugosi's right of publicity. Since plaintiffs inherited that right upon Lugosi's death, they are entitled to relief for Universal's tortious conduct.

### C. COPYRIGHT, PREEMPTION AND FREEDOM OF EXPRESSION

Universal asserts that a common law proprietary interest in one's name and likeness may not be recognized because such recognition is preempted by congressional legislation under the copyright clause of the United States Constitution. (See 17 U.S.C. § 301 (a); *Sears, Roebuck & Co. v. Stiffel Co.* (1964) 376 U.S. 225 [11 L.Ed.2d 661, 84 S.Ct. 784]; *Compco Corp. v. Day-Brite Lighting, Inc.* (1964) 376 U.S. 234 [11 L.Ed.2d 669, 84 S.Ct. 779].) That section provides that Congress shall have the power "[t]o promote the progress of science and useful arts, by securing for limited times to authors...the exclusive right to their...writings...." (U.S. Const., art. I, § 8, cl. 8.)

Under this clause, Congress could, at most, enact legislation governing all "writings." (See 17 U.S.C. § 102.)[34] The United States Supreme Court has recently defined writings "to include any physical rendering of the fruits of creative intellectual or aesthetic labor." (*Goldstein* v. *California, supra,* 412 U.S. at p. 561 [37 L.Ed.2d at p. 177]. See 1 Nimmer on Copyright, *supra,* § 1.08.) The intangible proprietary interest protected by the right of publicity simply does not constitute a writing. That interest may be valuable due to the individual's creative intellectual labors, but the publicity value generated by these labors is not focused in a "physical rendering." To conclude that the right of publicity is subject to congressional regulation under the copyright clause is to find that not only an author's writings, but also his mind, are subject to such control. Such a position is untenable. Thus, congressional action has not preempted the recognition of common law protection for the right of publicity. (Accord *Price* v. *Hal Roach Studios, Inc., supra,* 400 F.Supp. at pp. 845-846.)

---

[34]Section 102 provides in part: "Copyright protection subsists...in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device."

Any doubt on this issue was removed by the recent United States Supreme Court decision in *Zacchini* v. *Scripps-Howard Broadcastig Co., supra,* 433 U.S. 562. That case involved a television broadcast of plaintiff's entire performance in a human cannonball act. The Supreme Court found no impediment to the State of Ohio providing plaintiff with the "'right to the publicity value of his performance.'" (*Id.,* at p. 565 [53 L.Ed.2d at p. 969].) "The Constitution does not prevent Ohio from...deciding to protect the entertainer's incentive in order to encourage the production of this type of work." (*Id.,* at p. 577 [53 L.Ed.2d at p. 977].) If federal copyright law does not preclude a state from granting protection to an uncopyrighted performance, a fortiori the recognition of common law protection for the proprietary interest in one's name and likeness is immune from such attack. (See Note, *supra,* 42 Brooklyn L.Rev. at p. 545, fn. 85; Note, *supra,* 30 Stan.L.Rev. at pp. 1188, fn. 8, 1192-1194. Cf. *Kewanee Oil Co.* v. *Bicron Corp.* (1974) 416 U.S. 470 [40 L.Ed.2d 315, 94 S.Ct. 1879]; *Goldstein* v. *California, supra,* 412 U.S. 546.)[35]

Recognizing plaintiffs' succession to Lugosi's right of publicity in his portrayal of Count Dracula does not interfere with the rights granted Universal under federal law in its copyrighted motion picture *Dracula.* In producing the film, Universal bargained and paid Lugosi for only limited rights: to employ Lugosi to portray Count Dracula in the production of one motion picture. (See discussion in section III, *post.*) Universal was and is free to exploit Lugosi's performance in that film within the confines of the copyright law. Universal can no more complain that its inability to merchandise Lugosi's image precludes the full use of its motion picture than protest that its inability to use scenes from *Dracula* in another motion picture restricts such use. Not having bargained for such rights, there is no entitlement. (Accord *Price* v. *Hal Roach Studios, Inc., supra,* 400 F.Supp. at pp. 842-843.)[36]

---

[35]It appears that Universal's misplaced reliance on the preemption doctrine was based, in part, on a misunderstanding of the scope of rights recognized by the trial court. Lugosi's beneficiaries were not declared to have any control over the Count Dracula character. Nothing in Lugosi's right of publicity precludes others from portraying Count Dracula and exploiting or filming such characterizations. Rather, Lugosi was declared to have a proprietary interest in his likeness, which includes his likeness in his portrayal of Count Dracula. (See discussion at pp. 844-845, *ante.*)

[36]Universal relied on several decisions which refused to find any protectable interest in plaintiff's performance where such protection would significantly interfere with the use of an underlying copyrighted work. (See, e.g., *Sinatra* v. *Goodyear Tire & Rubber Co.* (9th Cir. 1970) 435 F.2d 711; *Booth* v. *Colgate-Palmolive Co.* (S.D.N.Y. 1973)

Finally, I am sensitive to the fact that enforcement of the right of publicity may conflict with freedom of expression in some cases. However, such a conflict is not presented in this case. Plaintiffs challenged Universal's licensing of Lugosi's likeness in his portrayal of Count Dracula in connection with the sale of such objects as plastic toy pencil sharpeners, soap products, target games, candy dispensers and beverage stirring rods. Such conduct hardly implicates the First Amendment. (See *Rosemont Enterprises, Inc.* v. *Urban Systems, Inc., supra,* 72 Misc.2d 788 [340 N.Y.S.2d at pp. 146-147], affd. as mod. 42 App. Div.2d 544 [345 N.Y.S.2d 17] [games]; *Rosemont Enterprises* v. *Choppy Productions* (1972) 74 Misc.2d 1003 [347 N.Y.S.2d 83, 85] [T-shirts, sweatshirts]. Compare *Factors Etc., Inc.* v. *Pro Arts, Inc., supra,* 579 F.2d 215 [production of poster of Elvis Presley entitled "In Memory" not protected] with *Paulsen* v. *Personality Posters, Inc.* (1968) 59 Misc.2d 444 [299 N.Y.S.2d 501] [Production of poster of Pat Paulsen in comic attire entitled "For President" protected].) This unauthorized exploitation of plaintiffs' proprietary interest in these commercial merchandising products is no more insulated from suit by the constitutional guarantees of freedom of expression than Universal's refusal to pay Lugosi for his services in portraying Count Dracula in *Dracula* would be. (Cf. *Zacchini* v. *Scripps-Howard Broadcasting Co., supra,* 433 U.S. 562; *Grant* v. *Esquire, Inc., supra,* 316 F.Supp. at p. 884.)

### III. THE 1930 EMPLOYMENT AGREEMENT

In their 1930 employment agreement, Lugosi granted Universal certain rights to use his likeness and appearance as Count Dracula.[37] The trial court interpreted the contract to entitle Universal to use Lugosi's likeness only in the motion picture *Dracula* and in related advertisements. Universal argues that the grant-of-rights provision in that contract entitled Universal to license Lugosi's portrayal of Count Dracula in connection with the sale of commercial merchandising products.

---

362 F.Supp. 343.) Protecting plaintiffs' interest in this case does not limit Universal's ability to broadcast or advertise *Dracula*. Hence, those decisions are wholly irrelevant to the issues presented here.

[37]Paragraph 4 of the 1930 contract contains the grant of rights from Lugosi to Universal: "The producer shall have the right to photograph and/or otherwise produce, reproduce, transmit, exhibit, distribute, and exploit *in connection with the said photoplay any and all of the artist's acts, poses, plays and appearances* of any and all kinds hereunder, and shall further have the right to record, reproduce, transmit, exhibit, distribute, and exploit in connection with said photoplay the artist's voice, and all instrumental, musical, and other sound effects produced by the artist in connection

Universal correctly contends that if the trial court's interpretation were based solely on an examination of the contract, the interpretation of the contract is a question of law and this court will independently review the validity of the trial court's construction. (*Argonaut Insurance Co.* v. *Transport Indemnity Co.* (1972) 6 Cal.3d 496, 502 [99 Cal.Rptr. 617, 492 P.2d 673].) However, if the trial court were presented with conflicting extrinsic evidence to aid in the interpretation of the contract, "a reasonable construction of the agreement by the trial court which is supported by substantial evidence will be upheld. [Citations.]" (*In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 746-747 [131 Cal.Rptr. 873, 552 P.2d 1169]; *Grove* v. *Grove Valve & Regulator Co.* (1970) 4 Cal.App.3d 299, 310 [84 Cal.Rptr. 300]. See generally, 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, §§ 235 and 245, pp. 4225-4226, 4236-4238.)

The trial court was presented with conflicting expert testimony on the nature of the rights granted under the grant-of-rights provision and on whether an actor employed to perform in a motion picture usually retained or ceded the commercial merchandising rights in his likeness and appearance. Further, it is undisputed that in 1936 Universal requested and received Lugosi's permission to use in its production of *Dracula's Daughter* a wax likeness of Lugosi's portrayal of Count Dracula in *Dracula*. It is reasonable to infer that Universal would not have sought such consent if the 1930 contract granted Universal the broad right to use Lugosi's likeness which Universal now asserts. (See *Warner Bros. Pictures* v. *Columbia Broadcasting System* (9th Cir. 1954) 216 F.2d 945, 949. Cf. *Bohman* v. *Berg* (1960) 54 Cal.2d 787, 795 [8 Cal.Rptr. 441, 356 P.2d 185]; *Tanner* v. *Title Insurance and Trust Co.* (1942) 20 Cal.2d 814, 823 [129 P.2d 383].) Such evidence provides a substantial basis for sustaining the trial court's reasonable interpretation of the grant-of-rights provision in the 1930 contract.[38] Indeed, an independent

---

with such acts, poses, plays and appearances. The producer shall likewise have the *right to use and give publicity to the artist's name and likeness,* photographic or otherwise, and to recordations and reproductions of the artist's voice and all instrumental, musical, and other sound effects produced by the artist hereunder, *in connection with the advertising and exploitation of said photoplay.*" (Italics added.)

[38]On the day following the execution of that contract, Lugosi and Universal entered into an option agreement for a term contract for the exclusive use of Lugosi's services. If the parties to the September 11, 1930, contract had sought to confer on Universal the right to exploit Lugosi's likeness in merchandising commercial products, as Universal here contends, that contract could have incorporated the more specific language in the term contract attached to the September 12, 1930, option agreement. Paragraph 4 of the term contract provided in part: "The artist does also hereby grant to the produc-

examination of that contractual provision, with its repeated limitation on the use of Lugosi's likeness only "in connection with said photoplay," reaffirms the trial court's conclusion.[39]

Contrary to Universal's assertion, Labor Code section 2860[40] does not compel a different result. "...[Section 2860] is to be construed as but an expression of the familiar principle that forbids an agent or trustee from using the trust property or powers conferred upon him for his own benefit...." (*Burns* v. *Clark* (1901) 133 Cal. 634, 639 [66 P. 12]. Accord *Southern Cal. Disinfecting Co.* v. *Lomkin* (1960) 183 Cal.App.2d 431, 444 [7 Cal.Rptr. 43]; *Williams* v. *Weisser, supra,* 273 Cal.App.2d at pp. 733-734.) That statute applies to a limited class of cases, primarily involving the exploitation of an employer's confidential information or trade secrets by a former employee to the employer's detriment. For example, the statute has been considered applicable in actions to enjoin a former employee from unauthorized use of confidential information concerning customers along a laundry route (*Empire Steam Laundry* v. *Lozier* (1913) 165 Cal. 95 [130 P. 1180]) and an ice route (*Santa Monica Ice etc. Co.* v. *Rossier* (1941) 42 Cal.App.2d 467 [109 P.2d 382]), a confidential list of subscribers to a specialized newsletter (*California Intelligence Bureau* v. *Cunningham* (1948) 83 Cal.App.2d 197 [188 P.2d 303]), and trade secrets concerning the production of cactus phonographic needles (*Riess* v. *Sanford* (1941) 47 Cal.App.2d 244 [117 P.2d 694]).

---

er, during the term hereof, the sole and exclusive right to make use of, and to allow others to make use of, his name for advertising, commercial, and/or publicity purposes (other than in connection with the acts, poses, plays and appearances of the artist hereunder), as well as the sole and exclusive right to make use of and distribute, and to allow others to make use of and distribute, his pictures, photographs, or other reproductions of his physical likeness and of his voice for like purposes...."

[39]Contrary to Universal's assertion, the court's interpretation of the contracts at issue in *Republic Pictures Corp.* v. *Rogers* (9th Cir. 1954) 213 F.2d 662, is inapposite. First, the contracts there specifically provided for the use of the actor's name and likeness for advertising purposes unrelated to the promotion of the motion pictures involved. (*Id.,* at pp. 663-664.) Second, the issue presented there was whether those motion pictures could be televised. The court expressly stated that it was not adjudicating the right to use the artist's name or likeness in commercial advertising. (*Id.,* at p. 666.) In contrast, the court in *Price* v. *Hal Roach Studios, Inc., supra,* 400 F.Supp. 836, confronted with contractual language comparable to that in the present case, adopted an interpretation similar to the trial court's construction. (*Id.,* at pp. 839-841.)

[40]"Everything which an employee acquires by virtue of his employment, except the compensation which is due to him from his employer, belongs to the employer, whether acquired lawfully or unlawfully, or during or after the expiration of the term of his employment."

No such conduct is present here. Lugosi is not alleged to have "acquired" something from Universal which he improperly exploited. Rather, the issue is to what extent can Universal exploit Lugosi's portrayal of Count Dracula. The contract delineates the scope of Universal's entitlement: it clearly limited Universal's use to exploitation "in connection with said photoplay" (*ante,* fn. 37). The extrinsic evidence presented to the trial court supports that construction. Hence, the contract negates any suggestion that Universal may be entitled, under the doctrine embodied in section 2860, to unlimited use of Lugosi's likeness while portraying Count Dracula. (See *Zahler* v. *Columbia Pictures Corp.* (1960) 180 Cal.App.2d 582, 589 [4 Cal.Rptr. 612].)

## IV. THE STATUTE OF LIMITATIONS, DAMAGES AND PREJUDGMENT INTEREST

Neither party disputes the trial court's determination that the applicable statute of limitations is two years, as prescribed in Code of Civil Procedure section 339, subdivision 1. Universal asserts, however, that because this action was initiated in 1966, more than two years after the consummation of the first licensing agreement in 1960, plaintiffs are barred from any recovery.

Universal concluded approximately 50 licensing agreements with unrelated manufacturers between 1960 and 1966 and continued to enter into new agreements, and to amend and renew existing contracts, after this action was commenced. The execution of the first agreement did not contractually or otherwise compel Universal to conclude the others. The extensions or renewals of existing contracts were not mandated by the terms of the original agreements. I, therefore, agree with the trial court that each licensing agreement and renewal thereof represented a separate and distinct invasion of plaintiffs' rights. The execution of each agreement was independent of the others and each could have supported a separate cause of action. (Cf. *Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 937 [101 Cal.Rptr. 568, 496 P.2d 480].) Hence, the statute of limitations is not a complete bar to recovery.

The trial court held plaintiffs were barred from recovering damages for any licensing agreement executed more than two years before the filing of this action in 1966. (Code Civ. Proc., §§ 312 and 339, subd. 1.) Plaintiffs assert that the statutory period should not be calculated from the filing of the 1966 action but from the filing of the 1963 action,

which involved substantially the same claims, on the ground that the 1966 suit is merely a continuation of the 1963 suit.

While a lawsuit has been construed as the continuation of an earlier action in several decisions relied on by plaintiffs (see, e.g., *Bollinger* v. *National Fire Ins. Co.* (1944) 25 Cal.2d 399 [154 P.2d 399]; *Schneider* v. *Schimmels* (1967) 256 Cal.App.2d 366 [64 Cal.Rptr. 273]), the present case is readily distinguishable. First, in contrast to those decisions, the dismissal of the 1963 suit was on *plaintiffs' own motion* and was not the product of Universal's conduct. Second, plaintiffs were arguably responsible for the problem which caused the dismissal. Third, the second suit was not filed until 28 months after the dismissal. Finally, the dismissal did *not* preclude a trial on the merits. I thus conclude that the trial court did not err in calculating the statutory period from the filing of the underlying action, February 3, 1966.

After an extended trial, the court found that the plaintiffs were entitled to damages arising out of Universal's execution after February 3, 1964, of licensing agreements with approximately 35 different manufacturers. While Lugosi's portrayal of Count Dracula was the only character licensed in two of those agreements, each of the other contracts authorized the use of up to ten additional horror characters. Most of these agreements provided for the payment of a nonrefundable fee to Universal upon the execution of the licensing agreement as partial consideration for the grant of rights and as an advance against the royalties to be paid for the use of the licensed characters. Universal's royalty was usually set as a percentage of the licensee's sales.

From these contracts, Universal received more than $260,000 in royalties.[41] The trial court awarded plaintiffs $53,023.23 of this amount for Universal's licensing Lugosi's portrayal of Count Dracula. Universal raises numerous challenges to this award.

Because the use of Lugosi's likeness in this context resembles a copyright or patent infringement, the well developed principles for determining damages in those contexts provide a useful guide.[42] Plaintiff has the

---

[41]Universal received hundreds of thousands of dollars in additional royalties in connection with similar licensing agreements for which plaintiffs could not seek damages due to the statute of limitations.

[42]See, e.g., *Sheldon* v. *Metro-Goldwyn Corp.* (1940) 309 U.S. 390 [84 L.Ed. 825, 60 S.Ct. 681] (copyright); *Orgel* v. *Clark Boardman Co., Ltd.* (2d Cir. 1962) 301 F.2d 119 (copyright); *Westinghouse Co.* v. *Wagner Mfg. Co.* (1912) 225 U.S. 604 [56 L.Ed.

initial burden of proving the extent of the profits reaped by defendant through its misappropriation. However, where a portion of defendant's profits derives from other than the unauthorized use but defendant had commingled the sources of income, the defendant "carries the burden of disentangling the contributions of the several factors which he has confused." (*Sheldon* v. *Metro-Goldwyn Pictures Corporation* (2d Cir. 1939) 106 F.2d 45, 48, affd. 309 U.S. 390 [84 L.Ed. 825, 60 S.Ct. 681].) If the defendant provides sufficient evidence, a fair division of the profits will result. "Mathematical exactness" in the apportionment is not required. (*Id.*, 309 U.S. at p. 404 [84 L.Ed. at p. 833].) However, the resulting allocation must "favor the plaintiffs in every reasonable chance of error." (*Id.*, 106 F.2d at p. 51.)

Universal's conduct prevented an apportionment of the royalty income between the Count Dracula character and the other licensed characters. Neither the licensing agreements nor Universal's accounting system allocated the royalty payments from each contract among the licensed characters. The isolated data provided by a few licensees about certain agreements was not persuasive on this matter to the trial court. Absent more compelling data, the trial court found that one-third of the income from multi-character contracts should be allocated to the use of Count Dracula.[43]

This restrained apportionment reflected the trial court's assessment of Count Dracula's relatively greater public visibility and resulting commercial value when compared to the other licensed characters, such as the Mutant and the Mole Man. While most of the licensee's secured the right to use only some of the available characters, they consistently secured the right to Count Dracula. Universal's assertion, that plaintiffs are only entitled to an amount equal to the royalty from each agreement divided by the number of licensed characters, is based on the unsupported assumption that all horror characters are equally valuable. In light of Universal's burden in this case, I am not persuaded the trial court's allocation was unreasonable.[44]

---

1222, 32 S.Ct. 691] (patent); *Carter Products, Inc.* v. *Colgate-Palmolive Co.* (D.Md. 1963) 214 F.Supp. 383, 397 (patent); 3 Nimmer on Copyright (1978) section 14.03[C]. See also 4 Callman, The Law of Unfair Competition, Trademarks and Monopolies (3d ed. 1978) section 89.3 (a), page 285 and section 89.3 (b) pages 306-310 (trademarks).

[43]The income from one multiple character licensing agreement was allocated somewhat differently in light of specific information concerning that agreement.

[44]In *Sheldon,* there was evidence that 5 to 12 percent of the defendant's receipts should be allocated to plaintiff for the infringement; an award of 20 percent was

Universal was unable to identify the source of approximately $14,000 of the $260,000 in royalties received from horror character licensing agreements. Finding that Universal had not borne its burden of demonstrating the origin of that sum, the trial court allocated the entire sum to the licensing of Count Dracula. Universal asserts that only one-third of that amount should have been allocated to the use of Count Dracula, consistent with the one-third allocation adopted by the trial court for royalties from multicharacter agreements.

However, it is undisputed that two of the agreements licensed the use of only Count Dracula. All of the royalties from those agreements were thus awarded to plaintiffs. In light of Universal's burden and plaintiffs' entitlement to all royalties from certain agreements, the trial court's resolution was not error.

The trial court also awarded all royalty income received between July 1, 1972, and October 31, 1972, to plaintiffs.[45] The $4,500 at issue was apparently derived from multiple character agreements, which had otherwise been subjected to a one-third apportionment. The trial court's findings do not clearly set forth the rationale behind the different treatment accorded the royalties received during this period. Therefore, I would remand this aspect of the damage award to the trial court. On remand, the trial court would not be precluded from considering a different apportionment if the income received in this period was recorded in a separate account to prevent its discovery by plaintiffs or was the product of licensing agreements concluded in violation of the interlocutory injunction. However, absent special circumstances, royalties received under multicharacter agreements concluded before the entry of the interlocutory injunction should be divided in accordance with the one-third allocation adopted by the court.

Universal also challenges the trial court's conclusion that the statute of limitations did not bar plaintiffs from recovering damages based on Universal's agreement with ABG Products Inc. The agreement was ex-

---

upheld. (309 U.S. at p. 408 [84 L.Ed. at p. 835].) In this case, one licensing agreement proposed 25 percent of the advance royalty be allocated to Count Dracula. Further, the defendant proposed a 25 percent allocation of certain unidentified income. The trial court awarded plaintiffs 33⅓ percent of the profits, which is comparable to the award in *Sheldon*.

[45]The court's findings inconsistently refer to this period as commencing "after June 30, 1972," and "from July 31, 1972." However, the record makes it clear that it is the period after June 30, 1972, which is in issue.

ecuted on January 30, 1964, with a term from March 1, 1964, to March 28, 1965. The licensee was obligated to pay Universal a $500 nonrefundable fee upon the execution of the agreement. The contract was subsequently extended to expire on March 28, 1967.

The trial court found that recovery for contracts executed prior to February 3, 1964, was barred by the statute of limitations. This contract was clearly executed before that date, and Universal received an immediate payment for licensing the use of the horror characters, including Count Dracula. Since Universal's tortious conduct consisted of licensing Lugosi's portrayal of Count Dracula and that act occurred beyond the statutory period, it is inconsequential that the licensee could not begin to sell its products until after February 3, 1964. (Cf. *Davies* v. *Krasna, supra,* 14 Cal.3d at pp. 513-514.) On remand, I would direct the trial court to delete any award of damages arising from the January 30, 1964, contract. However, it is equally clear that plaintiffs remain entitled to damages based on any royalty paid under any extension or renewal of that contract after February 3, 1964.[46]

The trial court awarded plaintiffs prejudgment interest under Civil Code section 3288 on the entire amount of the damages from the midpoint of the infringement, January 1, 1969. Section 3288 gives the trial court discretion to award prejudgment interest "[i]n an action for the breach of an obligation not arising from contract...." An award of interest under section 3288 is not conditioned on plaintiff's damages having been liquidated at the date from which the interest is calculated. (See *Bullis* v. *Security Pac. Nat. Bank* (1978) 21 Cal.3d 801, 814-815 [148 Cal.Rptr. 22, 582 P.2d 109].) Here, Universal had the use of some of the profits from their infringement for a decade prior to the entry of judgment. In this case, I do not find that the award of interest, from the midpoint of the infringement, was an abuse of discretion. (See *Amador*

---

[46]Universal's similar claims with regard to its contracts with AA Records, Inc., and Colgate-Palmolive Co. are not persuasive. The recovery awarded in connection with the AA Records' contract related to extensions of that contract concluded after February 3, 1964. While the Colgate-Palmolive contract was ostensibly executed on December 16, 1963, the February 6, 1964, letter agreement between them provides that "[w]e are currently herewith entering into an agreement..." for the licensing of certain horror characters. Moreover, it is the February 6th agreement which first specifies that the Count Dracula character licensed is Lugosi's portrayal of Dracula. The December 16th agreement did not so specify. Hence, there was no misappropriation of Lugosi's likeness until after February 3d, and the contract was thus properly treated by the trial court.

Given Universal's burden, I find that Universal's remaining contentions are also without merit.

*Valley Investors* v. *City of Livermore* (1974) 43 Cal.App.3d 483, 494-495 [117 Cal.Rptr. 749].)

## V. CONCLUSION

Judicial recognition and protection of the proprietary interest in one's name and likeness is not an unjustified foray by the judiciary into the legislative domain but a recognition of the common law's sensitivity to the evolution of societal needs and its ability to adapt to new conditions. The trial court properly found Lugosi had a right of publicity in his likeness in his portrayal of Count Dracula and that the right descended to plaintiffs as his beneficiaries.

The right of publicity is distinct from the right of privacy. The majority's effort to squeeze the former into the traditional parameters of the latter is ultimately destructive of both rights. To accommodate the right of privacy to the realities of the commercial use of a celebrity's identity, the majority hastily provided that the right was assignable. Yet, the right of privacy has heretofore been considered a personal, nonassignable right. In characterizing a prominent individual's interest in the commercial uses of his identity as solely affecting the right of privacy, the majority have failed to confront the dual nature of such appropriations. In the process, the individual's interest has been undervalued, and a salutary development in the common law—hailed in other jurisdictions—has been aborted.

I would reverse the judgment and remand the cause to the trial court with directions to modify the damage award and injunction consistent with the views expressed herein. In all other respects, I would affirm the judgment.

Tobriner, J., and Manuel, J., concurred.